2009 WY 139

**EXXON MOBIL CORPORATION,**
**Appellant (Petitioner),**

v.

**The STATE of Wyoming, DEPARTMENT**
**OF REVENUE, Appellee**
**(Respondent).**

**No. S–08–0098.**

Supreme Court of Wyoming.

Nov. 12, 2009.

Representing Appellant: Patrick R. Day and Walter F. Eggers, III, Holland & Hart, LLP, Cheyenne, Wyoming; Brent R. Kunz, Hathaway & Kunz, PC, Cheyenne, Wyoming. Argument by Mr. Day.

Representing Appellee: Bruce A. Salzburg, Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General. Argument by Mr. Hardsocg.

Before VOIGT, C.J., and GOLDEN, HILL, and BURKE, JJ., and KAUTZ, D.J.

BURKE, Justice.

[¶ 1] ExxonMobil Corporation's LaBarge Project in southwestern Wyoming has been "a prolific source of various valuable gasses," as well as "a prolific source of tax litigation." *Wyoming Dep't of Revenue v. Exxon Mobil Corp.*, 2007 WY 112, ¶ 6, 162 P.3d 515, 519 (Wyo.2007). The current litigation brings before us ExxonMobil's dispute with the Wyoming Department of Revenue over the taxation of natural gas for production year 2005. The Board of Equalization first heard and decided the dispute. ExxonMobil appealed two key aspects of the Board's decision to the district court. Pursuant to W.R.A.P. 12.09(b), the district court certified the case directly to us for review. For the reasons set forth in this opinion, we will reverse the decision of the Board, and remand the case for further proceedings.

### ISSUES

[¶ 2] ExxonMobil states these issues for our consideration:

1. The State Board of Equalization determined that ExxonMobil's Black Canyon facility is an "initial dehydrator" for point of valuation purposes under Wyo. Stat. Ann. § 39–14–203(b)(iv). Did the Board err in that conclusion?

2. In applying the proportionate profits statute, the Department of Revenue deducted ExxonMobil's post-processing transportation expenses from gross revenues rather than including those expenses in the denominator of the direct cost ratio as required by statute. Did the Board err when it affirmed the Department's creation of a direct cost ratio that is contrary to the one set forth in the proportionate profits statute?

The Department raises essentially the same issues in different words:

1. Did the State Board of Equalization correctly determine that ExxonMobil's Black Canyon dehydration facility is the initial dehydrator and not a "processing

facility" pursuant to Wyo. Stat. Ann. § 39–14–203(b)(iv)?

2. Did the State Board of Equalization correctly affirm the Department of Revenue's method of deducting post-plant transportation costs and determination that post-plant transportation costs are not included in the direct cost ratio pursuant to Wyo. Stat. Ann. § 39–14–203(b)(vi)(D)?

### FACTS

[¶ 3] Because the facts in this case are essentially undisputed, we will rely largely on paraphrases of and quotations from the Board's Findings of Fact.[1] The LaBarge Project includes eighteen natural gas wells in three federal gas units in the Bridger–Teton National Forest in Sublette County, Wyoming. The natural gas stream from these wells is composed of approximately 65% carbon dioxide, 22% methane, 7% nitrogen, 5% hydrogen sulfide, and 0.6% helium, with trace amounts of various other components. As described by the Board:

> The LaBarge gas, unlike most natural gas in Wyoming, is not flammable before processing. It is a unique gas stream, and may in fact be the lowest BTU gas produced in the world. The gas stream is lethal due to its high concentration (50,000 parts per million) of hydrogen sulfide. A concentration of 700 parts per million of $H_2S$ in a gas stream can be fatal. In addition, when in contact with water, both $H_2S$ and $CO_2$ form corrosive acids which can destroy a carbon steel pipeline. In the view of the Department, . . . no other natural gas stream in Wyoming is "remotely similar."

[¶ 4] From the well fields, the raw natural gas stream is piped approximately five miles to the Black Canyon facility where the gas is dehydrated. From Black Canyon, it is piped another forty miles to the Shute Creek facility where it is processed and separated into marketable products. Ordinarily, sour natural gas[2] is not dehydrated before it is processed. At the other facilities in Wyoming where sour natural gas is processed, the raw gas stream is delivered directly from the wells into a processing facility, without any intervening dehydration. The unusual configuration of the LaBarge Project was necessary largely because of environmental constraints.

[¶ 5] ExxonMobil had initially planned that all of the processing and dehydration would be done at Black Canyon, but because of the environmental sensitivity of that site, ExxonMobil was required to locate the main processing facilities approximately forty miles south at the Shute Creek site. Because of safety and operational constraints, however, the sour natural gas had to be dehydrated before it was sent on to Shute Creek. That is because this gas stream contains extremely high concentrations of hydrogen sulfide and carbon dioxide along with water vapor. Such concentrations of hydrogen sulfide and carbon dioxide, in contact with water, can form acids corrosive enough to destroy a carbon steel pipeline, along with hydrates that could plug the pipeline. To prevent this, ExxonMobil dehydrates the sour gas at Black Canyon, then sends the dehydrated gas to Shute Creek for further processing. Further complicating the arrangement, the Shute Creek processing system requires wet gas, so ExxonMobil must inject water back into the gas stream before processing it at Shute Creek.

[¶ 6] Black Canyon is a notably large and complex facility. It is designed to handle as much as 720 million cubic feet of raw gas per day. It is more than 2 million square feet in area, with office space for more than thirty full-time employees, a warehouse, a maintenance garage, and two separate processing train buildings. As the Board noted, "dehy-

---

1. Although we will reverse the Board's decision, we commend the Board for the "Findings of Fact, Conclusions of Law, and Order" it issued in this case. This document is thorough, well-written, and well-organized. Without it, our review of these complex issues and this voluminous record would have been far more difficult.

2. "Sour" gas has high levels of hydrogen sulfide, while "sweet" gas does not. See *Chevron U.S.A., Inc. v. Department of Revenue*, 2007 WY 79, ¶ 4, 158 P.3d 131, 133 (Wyo.2007). *See also* Wyo. Stat. Ann. § 39–14–201(a)(xxv), which defines "sweetening" as "any activity that removes acid gases, such as hydrogen sulfide and carbon dioxide, from the well stream."

dration of sour gas is inherently challenging and complex." With its high concentrations of hydrogen sulfide, the gas is extremely lethal. The water removed from the gas stream is also extremely acidic, and must be closely managed for safe disposal. Air quality considerations prohibit ExxonMobil from emitting any hydrogen sulfide, or from burning it, which would create sulfur dioxide. ExxonMobil must therefore recover and manage all of the contaminants removed from the gas stream.

[¶ 7] It is undisputed that the Black Canyon facility dehydrates the LaBarge Project gas stream. To do that, it sends the gas, in two separate streams, to dehydration towers. There, the gas rises while a triethylene glycol (TEG) solution "rains down" through the gas and absorbs water vapor. In addition to removing water vapor, the TEG solvent also removes a little of "every single component in a raw gas stream." Accordingly, the Black Canyon facility also removes hydrogen sulfide, carbon dioxide, and other components of the stream. In addition, after the LaBarge Project began operating, ExxonMobil discovered that the gas stream contained several unexpected naturally occurring contaminants, including dibenzothiophene and other heavy hydrocarbons. As will be discussed in more detail below, these heavy hydrocarbons began settling out of the gas stream and contaminating the equipment at Black Canyon, the pipeline to Shute Creek, and the processing equipment at Shute Creek. ExxonMobil was forced to develop a system for removing these heavy hydrocarbons from the gas stream, "otherwise the entire operation from Black Canyon through Shute Creek would eventually fail."

[¶ 8] At the Shute Creek plant, the gas is rehydrated, then stripped of hydrogen sulfide. The hydrogen sulfide is taken to sulfur recovery units and is either processed into a marketable sulfur product or reinjected back into the earth. The Shute Creek plant next removes carbon dioxide from the gas stream. The carbon dioxide that can be sold is sent through compressors and pipelines for delivery to petroleum recovery operations located a substantial distance away. Some carbon dioxide that cannot be sold is vented to the atmosphere. Finally, the remaining gas stream is separated and processed into the principal products of the gas stream, which are methane, liquefied natural gas, and helium. For all of the products processed and separated at Shute Creek, particularly carbon dioxide, methane, and sulfur, ExxonMobil incurs additional costs in transporting the products from Shute Creek to their point of sale.

[¶ 9] From 1986 through 2004, severance taxes for the LaBarge Project were calculated using an accounting methodology agreed to by the Department and ExxonMobil as part of a negotiated settlement of litigation. This settlement was necessary, at least in part, because of the unique chemical composition of the LaBarge gas stream and its attendant safety, transportation, and processing challenges. In May of 2004, the Department cancelled the settlement agreement, and directed that the 2005 taxes for ExxonMobil's LaBarge Project would be calculated using the proportionate profits valuation method set forth in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) (LexisNexis 2007). Disputes over the correct application of this valuation method generated this litigation between the Department and ExxonMobil.

## STANDARD OF REVIEW

[¶ 10] Our review of an administrative agency's decision is governed by the Wyoming Administrative Procedure Act, which, in pertinent part, provides that the reviewing court shall:

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record

of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c)(ii). We affirm an agency's findings of fact if they are supported by substantial evidence. *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo.2008). In this case, however, ExxonMobil does not challenge the Board's findings of fact. Rather, it asserts that the Board incorrectly applied the law to those facts, so that the Board's conclusions are not in accordance with the law. "As always, we review an agency's conclusions of law *de novo.*" *Id.,* ¶ 26, 188 P.3d at 561.

[¶ 11] The basic task before us is to interpret various provisions of Wyo. Stat. Ann. § 39–14–203 and determine whether the Board correctly applied this severance tax statute to the undisputed facts. Statutory interpretation presents a question of law which we review *de novo. Qwest Corp. v. State ex rel. Dept. of Rev.,* 2006 WY 35, ¶ 8, 130 P.3d 507, 511 (Wyo.2006).

> When interpreting statutes, we follow an established set of guidelines. First, we determine if the statute is ambiguous or unambiguous. A statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability. Unless another meaning is clearly intended, words and phrases shall be taken in their ordinary and usual sense. Conversely, a statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations.

*BP America Prod. Co. v. Department of Revenue,* 2006 WY 27, ¶ 20, 130 P.3d 438, 464 (Wyo.2006), quoting *State Dept. of Revenue v. Powder River Coal Co.,* 2004 WY 54, ¶ 5, 90 P.3d 1158, 1160 (Wyo.2004). If a statute is clear and unambiguous, we give effect to the plain language of the statute. *State ex rel. Wyo. Dept. of Revenue v. Union Pacific R.R. Co.,* 2003 WY 54, ¶ 12, 67 P.3d 1176, 1182 (Wyo.2003). To determine whether a statute is ambiguous, we are not limited to the words found in that single statutory provision, but may consider all parts of the statutes on the same subject. *Mathewson v. City of Cheyenne,* 2003 WY 10, ¶ 6, 61 P.3d 1229, 1232 (Wyo.2003). If a statute is ambig-

uous, we may resort to principles of statutory construction to determine the intent of the legislature. *Qwest,* ¶ 8, 130 P.3d at 511.

## DISCUSSION

### Issue I. Point of Valuation

#### A. Severance Tax

##### 1. Statutory Background

[¶ 12] Pursuant to Wyo. Stat. Ann. § 39–14–203(a)(i), "There is levied a severance tax on the value of the gross product extracted for the privilege of severing or extracting crude oil, lease condensate or natural gas in the state." This tax is imposed on the value of the natural gas at the time "the production process is completed." Wyo. Stat. Ann. § 39–14–203(b)(ii). It is not always clear, however, just where the production process is completed and other operations, such as transportation, are begun. *See, e.g., Union Pac. Resources Co. v. State,* 839 P.2d 356, 361 (Wyo.1992) (The legislature, oil and gas producers, and agencies "have struggled over the years to determine when the mining or production process is complete.").

[¶ 13] In 1990, the legislature made an effort to clarify the proper point of valuation. *See Kennedy Oil v. Department of Revenue,* 2008 WY 154, ¶ 22 n. 3, 205 P.3d 999, 1006 n. 3 (Wyo.2008). It enacted this statutory guidance:

> The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first.

Wyo. Stat. Ann. § 39–14–203(b)(iv). Significantly, this statute provides only two alternatives: Black Canyon is either an "initial dehydrator" as set forth in the first sentence, or a "processing facility" as set forth in the second sentence. There is no third option. The Board concluded that Black Canyon is an initial dehydrator. On appeal, we must

determine whether that conclusion is based on correct interpretation and application of this statute.

## 2. Application of the Statute

[¶ 14] As explained by an expert witness for ExxonMobil during the Board's hearing, dehydrators can be divided into three different types. The statute quoted above is relatively simple to apply to "Type 1" and "Type 2" dehydrators. It is more difficult to apply to "Type 3."

[¶ 15] The Type 1 dehydrator is a relatively small piece of equipment located at or near the well. It is used to dehydrate sweet natural gas, and typically handles the gas stream from a single well or a small group of wells. The expert witness estimated that Type 1 dehydrators constitute approximately 97% of the dehydrators in use in the United States. After dehydration, much of Wyoming's sweet natural gas already meets commercial quality standards, and can be sent directly from the dehydrators to the pipelines without further processing. A Type 1 dehydrator appears to be precisely the sort of "initial dehydrator" referred to in the first sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv): "The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator." Applying this statutory provision, the severance tax is imposed at the outlet of the initial dehydrator. *See, e.g., Williams Prod. RMT Co. v. Wyoming Dep't of Revenue*, 2005 WY 28, ¶ 34, 107 P.3d 179, 189 (Wyo.2005) (The statute "is quite clear in pronouncing that the natural gas production process is completed, for severance tax purposes, at the outlet of the initial dehydrator.").

[¶ 16] According to the expert witness, nearly all of the other dehydrators in use in the United States are Type 2 dehydrators. They are larger in capacity than Type 1 dehydrators, as they typically dehydrate gas gathered from a larger number of wells. Accordingly, they are generally located at a greater distance from the wells. Type 2 dehydrators are used on sour natural gas, and so are usually incorporated within a large and complex gas processing facility.

Type 2 dehydrators fall under the second sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv): "When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first." An example of a Type 2 dehydrator in Wyoming is the Whitney Canyon processing plant. *See Amoco Prod. Co. v. Department of Revenue*, 2004 WY 89, ¶ 29, 94 P.3d 430, 442 (Wyo. 2004) ("The parties to this case agree that no dehydration occurs in the field, so the point of valuation is either the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever comes first."). Other examples include the Lost Cabin plant, *see RME Petroleum Co. v. Wyoming Dept. of Revenue*, 2007 WY 16, ¶ 9, 150 P.3d 673, 677 (Wyo.2007); and the Carter Creek plant, *see Chevron U.S.A., Inc.*, ¶ 1, 158 P.3d at 132.

[¶] There are only five Type 3 dehydrators in the world according to the expert witness, and the only one in Wyoming is ExxonMobil's Black Canyon facility. Unlike a typical Type 1 dehydrator, Black Canyon is a very large and complex facility, is used to dehydrate the gas gathered from several wells, and is located approximately five miles from the well fields. Like a Type 2 dehydrator, Black Canyon dehydrates sour natural gas, but unlike a typical Type 2 dehydrator, Black Canyon is a stand-alone unit, not part of the larger processing facility located at Shute Creek. As the Board recited in its findings of fact, "In Wyoming, there are no other facilities which dehydrate highly sour raw gas. At the other facilities in Wyoming where raw sour natural gas is processed, the raw gas stream is delivered directly from the wells into a processing facility, without an intervening ... process." These unique characteristics make it difficult to classify the Black Canyon facility as either an initial dehydrator or a processing facility, as those terms are used in the statute. This difficulty is at the heart of the dispute between ExxonMobil and the Department over the correct point of valuation for severance tax purposes.

### B. Interpretation of the Statutory Terms

#### 1. Interpretation in *Williams*

[¶ 18] The terms "initial dehydrator" and "processing facility" are not defined in the statutes. However, we interpreted these terms in *Williams Prod. RMT Co. v. Wyoming Dep't of Revenue*, 2005 WY 28, ¶ 34, 107 P.3d 179 (Wyo.2005). That opinion provides guidance in our current efforts to interpret the statutory terms.

#### a. Initial dehydrator

[¶ 19] At issue in *Williams* was the proper point of valuation for coal bed methane [3] that was gathered from separate wellheads and sent through pipelines and compressors to a triethylene glycol (TEG) dehydrator, a fairly typical example of the Type 1 dehydrator discussed by ExxonMobil's expert witness. In *Williams*, the Department considered the TEG dehydrator to be the initial dehydrator and, under the first sentence of the statute, set the point of valuation at the dehydrator outlet. Williams disagreed, asserting that dehydration also occurred when the gas was gathered and compressed, long before the gas got to the TEG dehydrator. On that basis, Williams denied that the TEG dehydrator was the initial dehydrator, and contended that the correct point of valuation was at the gathering or compression stages where the gas was also dehydrated. *Id.*, ¶ 12, 107 P.3d at 184. After a hearing, the Board affirmed the Department's position, and Williams appealed to this Court.

[¶ 20] Because the statutes did not define the term "initial dehydrator," we turned to the statutory definition of "dehydrator," which is "a device which removes water vapor that is commonly associated with raw natural gas." Wyo. Stat. Ann. § 39–14–201(a)(vii) (LexisNexis 2003). Williams asserted that its gathering equipment and compressors removed water vapor from the raw natural gas, and therefore fell within the definition of a dehydrator. Because the gathering equipment and compressors were

upstream of the TEG dehydrator, Williams contended that they constituted initial dehydrators. The Court rejected Williams's position and affirmed the Board's decision on this basis:

> Citing to numerous pieces of technical evidence in the record, the Board found that, unlike the incidental separation of water and CBM in headers and compressors, and in the pipeline, itself, the TEG dehydrator is a specialized dehydrator—a particular piece of equipment. The Board found this significant because of Wyo. Stat. Ann. § 39–14–203(b)(iv)'s location of the point of valuation at the outlet of the initial dehydrator—a piece of equipment—rather than at the initial place that any dehydration—a function—takes place. Once again, we find that the Board's interpretation of the statute to be consistent with legislative intent.

*Williams*, ¶ 22, 107 P.3d at 186. In other words, the gathering equipment and compressors caused some separation of water from the gas, but that was only incidental to their intended functions of gathering and compressing the gas. The TEG dehydrator was the "initial dehydrator" specified in the statute, because it was the first particular piece of equipment with the specialized and intended purpose of dehydrating the raw natural gas.

#### b. Processing facility

[¶ 21] We also rejected Williams's contention that its TEG dehydrator was a "processing facility." The term "processing facility" is not defined by statute, but the term "processing" is:

> any activity occurring beyond the inlet to a natural gas processing facility that changes the well stream's physical or chemical characteristics, enhances the marketability of the stream, or enhances the value of the separate components of the stream. Processing includes, but is not limited to fractionation, absorption, adsorption, flashing, refrigeration, cryogenics, sweetening, dehydration within a processing facility, be-

---

3. While *Williams* involved the taxation of coal bed methane rather than conventional natural gas, both types of natural gas are subject to the same severance tax statutes, and the distinction makes no difference in our current analysis.

neficiation, stabilizing, compression (other than production compression such as reinjection, wellhead pressure regulation or the changing of pressures and temperatures in a reservoir) and separation which occurs within a processing facility.

Wyo. Stat. Ann. § 39–14–201(a)(xviii).

■ [¶ 22] Williams argued that the TEG dehydrator was a processing facility because it performed at least some of the functions (*e.g.* absorption) listed in this statutory definition. The Board rejected that argument:

> The Board also relied upon the testimony of witnesses … as to characteristics of processing facilities and the lack of those characteristics in the [Williams] facilities. The "common understanding" of these witnesses was that there was "an identifiable universe of processing plants, such as Whitney Canyon, Painter, and Carter Creek." Clearly, within the industry, the term "processing facility" has a specialized meaning beyond a collection of disparate pieces of equipment.

*Williams,* ¶ 17 n. 2, 107 P.3d at 185 n. 2. We affirmed the Board's decision. Like an initial dehydrator, a processing facility is a particular facility constructed for an intended and specialized purpose. The purpose of a processing facility, in simplified terms, is to remove components such as condensate, natural gas liquids, or sulfur from the gas stream, *id.,* ¶ 19, 107 P.3d at 186, which changes the well stream's physical or chemical characteristics and enhances its marketability. Wyo. Stat. Ann. § 39–14–201(a)(xviii). The TEG dehydrator in *Williams* did separate some components from the gas stream, but that separation was only incidental to its intended function of dehydration. The TEG dehydrator was not a processing facility because it was not a particular facility with the intended and specialized purpose of removing these components from the gas stream.

### c. Application of the *Williams* interpretation to Black Canyon

#### i. Initial dehydrator

■ [¶ 23] As interpreted in *Williams,* the statutory term "initial dehydrator" is the first device or particular piece of equipment with the intended and specialized purpose of dehydrating natural gas. It is undisputed that the Black Canyon facility dehydrates natural gas, and is intended to do so. It is also undisputed that Black Canyon is the first such equipment in the LaBarge Project gas stream. For these reasons, the Department contends that Black Canyon is an initial dehydrator, falling within the first sentence of the statute.

[¶ 24] While ExxonMobil acknowledges that Black Canyon is a dehydrator, it insists that the legislature intended the statutory term "initial dehydrator" to apply to facilities very different from Black Canyon. Because the legislature did not define the term, ExxonMobil contends that the legislature must have intended to use it in a common and familiar way so it would be readily understood by the petroleum companies that are required to calculate, report, and pay the severance taxes they owe. ExxonMobil further maintains that Type 1 dehydrators are so common and familiar that the legislature must have had Type 1 dehydrators in mind when it used the term initial dehydrator without defining it. ExxonMobil then compares Type 1 dehydrators to the Black Canyon facility, and contends that the contrasts are so significant that the legislature could not have intended the term "initial dehydrator" to include both types.

[¶ 25] As the Board found, Type 1 dehydrators are "not significantly larger than a truck." The Black Canyon facility covers more than 2 million square feet, an area described by ExxonMobil's expert witness as equivalent to 30 football fields. Type 1 dehydrators are generally unstaffed, but checked periodically by field personnel. Black Canyon employs 35 full-time workers. Type 1 dehydrators are not individually designed, one-of-a-kind units, but can be ordered prepackaged and shipped to the site. Black Canyon is unique, a facility specifically designed and constructed to meet many unusual conditions encountered in the LaBarge Project. Type 1 dehydrators have historically vented their relatively small emissions directly into the atmosphere. At Black Canyon, both the air emissions and the water

outflow are highly toxic, and must be disposed of and managed carefully. Based on these striking differences between Type 1 dehydrators and Black Canyon, ExxonMobil asserts that the legislature could not reasonably have intended the statutory term "initial dehydrator" to encompass both Type 1 dehydrators and the Black Canyon facility. ExxonMobil therefore contends that Black Canyon is not an initial dehydrator.

[¶ 26] We acknowledge that the differences are dramatic, but as a legal matter, it is difficult to say that these differences disqualify Black Canyon as an "initial dehydrator." Both Type 1 dehydrators and Black Canyon use a TEG process to remove water vapor from the raw gas stream. Black Canyon is much larger in scale and complexity, which led the Department to characterize Black Canyon as a "dehydrator on steroids." In ExxonMobil's favor, we agree that it is a stretch to include both Black Canyon and Type 1 dehydrators within the same statutory classification. Still, we find no support in the statutes or our case law for the proposition that an initial dehydrator becomes something different when it reaches a certain size or complexity. At this point in our analysis, based solely on the interpretation from *Williams*, we would be inclined to agree with the Board's conclusion that Black Canyon is an initial dehydrator, though we remain troubled by that conclusion because the Black Canyon facility is so significantly different from the Type 1 dehydrators commonly used in the petroleum industry.

### ii. Processing facility

#### (A) Carbon dioxide and hydrogen sulfide

[¶ 27] In addition to removing water vapor from the natural gas stream, the Black Canyon facility also removes carbon dioxide and hydrogen sulfide. This changes the gas stream's physical or chemical characteristics, satisfying that part of the statutory definition of processing. Wyo. Stat. Ann. § 39–14–201(a)(xviii) (LexisNexis 2007). On this basis, ExxonMobil contends that Black Canyon is a processing facility. ExxonMobil further points out that the Black Canyon facility removes approximately 5,000 tons of hydrogen sulfide and 17,000 tons of carbon dioxide

on an annual basis. These amounts are so large that, according to ExxonMobil, their removal cannot be considered merely incidental to dehydration.

[¶ 28] The Department counters that the quantities of hydrogen sulfide and carbon dioxide may be large, but they constitute only a tiny fraction—roughly 1%—of the hydrogen sulfide and carbon dioxide found in the raw gas stream. The remaining 99% of these components remain in the gas stream until they are removed at the Shute Creek facility. Based on these proportions, the Department asserts that Black Canyon is a dehydrator that also happens to perform some processing functions.

[¶ 29] Given our interpretation of the term processing facility in *Williams*, however, the significant question is not the amount or the proportion of the components removed, but the intended and specialized purpose of the facility. If Black Canyon's removal of carbon dioxide and hydrogen sulfide from the gas stream is only incidental to its main function of dehydration, then Black Canyon may be an initial dehydrator. On the other hand, if Black Canyon has the intended and specialized function of removing the carbon dioxide and hydrogen sulfide, then it may be a processing facility.

[¶ 30] At Black Canyon, the gas stream is sent to a dehydration absorber tower, where it passes through a TEG solution that absorbs water vapor out of the gas stream. The TEG does not absorb water vapor alone, however. It also absorbs small amounts of nearly every component in the gas stream. The TEG solution therefore absorbs hydrogen sulfide and carbon dioxide along with the water vapor, removing them all from the gas stream. This description of Black Canyon's functions indicates that the removal of hydrogen sulfide and carbon dioxide is an unavoidable side-effect of the TEG treatment, not an intended and specialized purpose. Further, Black Canyon does not permanently remove the hydrogen sulfide and carbon dioxide from the gas stream. Almost all of those components are reinjected into the gas stream before it leaves Black Canyon and is sent to the Shute Creek facility, where these compo-

nents are permanently removed. The fact that Black Canyon removes these components only temporarily, then puts them back in the gas stream, suggests that their removal is not the intended and specialized function of the Black Canyon facility. Based on Black Canyon's removal of hydrogen sulfide and carbon dioxide from the gas stream, Black Canyon does not appear to fit the definition of a processing facility as that term is used in the statute.

### (B) Heavy hydrocarbons

■ [¶ 31] ExxonMobil also points out that the Black Canyon facility removes heavy hydrocarbons from the gas stream. When ExxonMobil began operating the Black Canyon facility, it learned that the raw gas contained unexpected concentrations of heavy hydrocarbons. These heavy hydrocarbons exit the wellhead in a gaseous phase, but later separate out as solids.[4] The solids began to foul and contaminate the equipment at Black Canyon, as well as the pipeline to Shute Creek and the processing equipment there. The accumulating heavy hydrocarbon solids threatened to render the entire project inoperable.

[¶ 32] ExxonMobil began cleaning the heavy hydrocarbon deposits from the equipment by hand, but found that to be an unsatisfactory long-term solution to the problem. Later, ExxonMobil developed and installed an activated carbon filtration system that adsorbs the heavy hydrocarbons and removes them from the gas stream. In 2003, ExxonMobil designed and installed a larger, improved carbon filtration system employing two large tanks, each holding 10,000 pounds of activated carbon, to adsorb and capture the heavy hydrocarbons. After the heavy hydrocarbons are removed from the gas stream at Black Canyon, they are disposed of by burning.

[¶ 33] ExxonMobil contends that the removal of heavy hydrocarbons at Black Canyon constitutes processing of the gas stream. The carbon filtration system performs the

processing function of adsorption, and it changes the physical and chemical characteristics of the gas stream. All of these are elements of the statutory definition of processing. Wyo. Stat. Ann. § 39–14–201(a)(xvii). The removal of heavy hydrocarbons enhances the value and marketability of the gas stream, because failing to remove them from the gas stream could cause the entire LaBarge Project to fail and render the gas stream worthless. Most significantly, it appears that the removal of heavy hydrocarbons is an intended and specialized purpose of the facility. It is done with equipment separate and apart from the TEG dehydrator, employing specially designed equipment constructed for the very purpose of removing the heavy hydrocarbons permanently from the gas stream. All of these factors support ExxonMobil's contention that Black Canyon fits the definition of a processing facility as we interpreted that term in *Williams*.

[¶ 34] The Department contends that the removal of heavy hydrocarbons does not constitute processing because the amount of heavy hydrocarbons removed is so small. But as we previously stated, the amount of carbon dioxide and hydrogen sulfide removed by the Black Canyon facility is not dispositive in determining whether it is a processing facility. Similarly, we conclude that the amount of heavy hydrocarbons removed at Black Canyon is not the determining factor. We note again that failure to remove the heavy hydrocarbons from the gas stream could force the LaBarge Project to shut down, which indicates that the removal of heavy hydrocarbons cannot be considered trivial or incidental. In sum, the removal of heavy hydrocarbons is a specialized and intended purpose of the Black Canyon facility, it changes the physical characteristics, and it enhances the value of the natural gas. Based on the *Williams* interpretation, Black Canyon appears to be a processing facility as that term is used in the second sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv).

---

4.  Other natural gas streams contain heavy hydrocarbons, but they also contain liquid hydrocarbons that dissolve the heavy hydrocarbon solids and prevent their build-up on the equipment.

The LaBarge gas stream contains no liquid hydrocarbons, so the heavy hydrocarbons are not dissolved, but instead separate out from the raw gas stream as solids.

[¶ 35] The Department also contended, and the Board agreed, that processing occurs only when saleable products are removed from the gas stream. The heavy hydrocarbons removed at the Black Canyon facility are not sold as a product, but are disposed of by burning. On this basis, the Board found that Black Canyon does not remove any saleable materials from the gas stream, and concluded that Black Canyon is not a processing facility.

[¶ 36] The Board inferred this "saleable products" test from our decision in *Williams*. In that case, as part of our effort to interpret the term processing facility, we considered the statutory definition of the term "natural gas," which for "the purposes of taxation ... includes products separated for sale or distribution during processing of the natural gas stream." *Williams*, ¶ 18, 107 P.3d at 185. We took this language to suggest "that the legislature understood processing would separate certain products from the natural gas stream." *Id.* The Board read this to mean that processing occurs only when a valuable or saleable product is removed from the gas stream. The heavy hydrocarbons removed at Black Canyon are not sold or distributed, and so applying the saleable products test, the Board determined that Black Canyon is not a processing facility.

[¶ 37] We reject this reading of our decision in *Williams*. The statutory definition of processing refers to "enhanc[ing] the marketability of the stream, or enhanc[ing] the value of the separate components of the stream." Wyo. Stat. Ann. § 39–14–201(a)(xviii). Removing the heavy hydrocarbons at Black Canyon clearly enhances the marketability and value of the gas stream. Otherwise, ExxonMobil would have no reason to remove the heavy hydrocarbons. While the statutory definition of "natural gas" does include "products separated for sale or distribution," that could as easily refer to the remaining gas stream, which is separated and sold or distributed, as to the heavy hydrocarbons. Neither the statutory definition nor our discussion in *Williams* provides support for the saleable products test applied by the Board.

[¶ 38] Further, the Department has not previously applied the saleable products test as it did here. Prior to the hearing, one of the Department's witnesses was deposed, and asked to define a processing facility. He stated that there "has to be a deliberate attempt to remove components from the gas stream, either valuable or nonvaluable components, that are items of natural gas other than water vapor." If the heavy hydrocarbons are considered nonvaluable components of the gas stream, Black Canyon's deliberate removal of them would constitute processing under this definition. At the hearing, however, this same witness testified that at a processing facility, there "must be a deliberate attempt to change the physical, chemical characteristics to make ... the natural gas or the product more marketable and available for sale and distribution." With this change to its definition, the Department asserted that a processing facility must remove a saleable product from the gas stream. While we generally defer to an agency's interpretation of the statutes it administers, an agency's statutory interpretation is entitled to little deference when it is contrary to prior practice and precedent. *RME*, ¶ 44, 150 P.3d at 689. Moreover, Black Canyon qualifies as a processing facility even under the Department's second definition, because its removal of heavy hydrocarbons makes either "the natural gas or the product more marketable." Black Canyon is not disqualified as a processing facility just because the heavy hydrocarbons it removes are not sold.

[¶ 39] We are also persuaded by Exxon-Mobil's argument that a saleable products test could lead to absurd results. At Shute Creek, ExxonMobil removes sulfur and carbon dioxide from the gas stream. Historically, there have been times when sulfur and carbon dioxide have had essentially no commercial value. During such times, Exxon-Mobil did not sell these components, but reinjected the sulfur back into the ground and vented the carbon dioxide to the atmosphere. *See Amoco Prod. Co. v. State*, 751 P.2d 379, 380 (Wyo.1988). Applying the saleable products test as the Board did here, the Department could treat Shute Creek as a processing facility when it is selling sulfur and carbon dioxide, but not when it is rein-

jecting or venting those components. Shute Creek's classification as a processing facility should not fluctuate with the market, and for this additional reason, we reject the saleable products test used by the Board.

#### d. Recap of *Williams* interpretations

[¶ 40] Our review of the Board's decision in light of the interpretations discussed in *Williams* yields mixed results. It is a close question because of the significant differences between the Black Canyon facility and the typical Type 1 dehydrator, but we are inclined to agree with the Department that Black Canyon fits the definition of an initial dehydrator. We are not convinced that Black Canyon is a processing facility based on its temporary removal of carbon dioxide and hydrogen sulfide from the gas stream, and yet we are inclined to agree with Exxon-Mobil that Black Canyon fits the definition of a processing facility because of its deliberate removal of heavy hydrocarbons. These contradictions require us to continue with our analysis.

#### 2. Interpretation based on industry usage

[¶ 41] In *Williams*, the Board expressly relied on "customary usage in the industry" to help interpret the term processing facility, and less explicitly, to help define the term initial dehydrator. *Williams*, ¶ 17 n. 2, 107 P.3d at 185 n. 2. In this case, ExxonMobil presented expert witnesses who testified to the Board that, within the petroleum industry, Black Canyon would not be considered an initial dehydrator. They testified that the Black Canyon facility has all of the functional attributes of a natural gas processing facility "as understood in the industry," and would be considered a processing facility under customary usage. The Department presented no industry experts to counter or disagree with this testimony.

[¶ 42] The Department asserted that ExxonMobil's expert testimony was not relevant. The Board agreed, ruling that "the exhibits and testimony presented by Dr. Enick and [Mr.] MacFarland might be appropriate if the question was how to characterize Black Canyon in a technical and engineering context, [but] such evidence does not shed any particular light on, nor significantly assist in the task at hand, which is to determine the Wyoming Legislature's intent in adopting . . . the term 'processing facility.'" This ruling by the Board contravenes well-established precedent. "[W]hen construing technical terms contained within statutes, we look to the meaning ascribed to those terms in the applicable field." *Williams*, ¶ 19, 107 P.3d at 185. Indeed, for technical terms, particular weight may be given to industry usage:

> If a word in a statute has a usual meaning and a technical meaning, the technical meaning is preferred as stated in § 8-1-103 W.S.1977, Cum.Supp.1987, which provides:
>
> (a) The construction of all statutes of this state shall be by the following rules, unless that construction is plainly contrary to the intent of the legislature:
>
> (i) Words and phrases shall be taken in their ordinary and usual sense, but ***technical words*** and phrases having a peculiar and appropriate meaning in law ***shall be understood according to their technical import.***

*Amoco Prod. Co.*, 751 P.2d at 383 (emphasis supplied in original; some internal punctuation omitted).

[¶ 43] The industry's characterization of Black Canyon as a processing facility, even if in the technical or engineering context, is highly relevant in determining what the legislature intended the terms initial dehydrator and processing facility to mean. The Board erred in refusing to consider this evidence. This error is especially troublesome because this evidence was essentially undisputed. The Department presented no industry expert to contest ExxonMobil's testimony that within the petroleum industry, Black Canyon would be considered a processing facility and not an initial dehydrator.

[¶ 44] The Department did present evidence that ExxonMobil has historically referred to Black Canyon as a dehydrator and to Shute Creek as a processing facility. This has been done in internal planning documents, and in documents submitted to reg-

ulatory agencies. We agree with the Department's contention that these historical references provide evidence that Black Canyon is a dehydrator. That evidence is of little use here, however, because it is undisputed that Black Canyon is a dehydrator. The question before the Board, and now before us, is whether Black Canyon is an initial dehydrator or a processing facility as those terms are used in Wyo. Stat. Ann. § 39–14–203(b)(iv).

[¶ 45] Administrative agencies have broad discretion in deciding to admit or exclude evidence. *Sinclair Oil Corp. v. Wyoming Public Service Comm'n*, 2003 WY 22, ¶ 41, 63 P.3d 887, 901 (Wyo.2003). In this case, however, the Board admitted the expert testimony into evidence, and used it as the basis for detailed findings of fact. It then ruled that the evidence was irrelevant and could be ignored. This was not a discretionary decision to admit or exclude evidence, but a legal decision about how the evidence could be used. We review this legal question *de novo*, and have an obligation to correct the Board's legal error. *Dale*, ¶ 26, 188 P.3d at 561.

[¶ 46] Evidence that the industry would consider Black Canyon a processing facility rather than an initial dehydrator is a strong factor in ExxonMobil's favor. Still, we are left with various plausible interpretations of the statutory language. Black Canyon seems to fit the definition of an initial dehydrator as interpreted in *Williams*, but it is not an initial dehydrator as that term is understood in the petroleum industry. Black Canyon may not be a processing facility because it removes carbon dioxide and hydrogen sulfide from the gas stream, but it may be because it removes heavy hydrocarbons. A statute is ambiguous if it is vague or uncertain and subject to varying interpretations. *Allied–Signal v. Wyoming State Bd. of Equalization*, 813 P.2d 214, 219–220 (Wyo. 1991). At this point in our analysis, we must conclude that the statutory terms initial dehydrator and processing facility, as used in Wyo. Stat. Ann. § 39–14–203(b)(iv), are ambiguous. This same conclusion has previously been suggested by the Board. *Williams*, ¶ 34, 107 P.3d at 189.

## C. Construction of the Severance Tax Statutes

[¶ 47] Because the statute is ambiguous, we rely upon principles of statutory construction in order to ascertain the legislative intent. *Qwest*, ¶ 8, 130 P.3d at 511. Two principles of statutory construction are particularly useful in this case. First is a principle of construction applicable to taxation statutes:

> "Tax statutes are to be construed in favor of the taxpayer and are not to be extended absent clear intent of the legislature." *Chevron U.S.A., Inc. [v. State]*, 918 P.2d [980,] 985 [ (Wyo.1996) ]. In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government and in favor of the citizen. *Amoco Production Co. v. Dept. of Revenue*, 2004 WY 89, ¶ 18, 94 P.3d 430, 438 (Wyo.2004). Thus, taxes may not be imposed by any means other than a clear, definite and unambiguous statement of legislative authority. *Chevron U.S.A., Inc.*, 918 P.2d at 984; *Amoco Production Co.*, ¶ 18[, 94 P.3d at 438–39]. *See also* Wyo. Const. art. 15, § 13 (stating "no tax shall be levied, except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied.").

*Qwest*, ¶ 9, 130 P.3d at 511–12 (paragraph breaks omitted). Construing the statute in favor of the taxpayer inclines us toward ExxonMobil's position that Black Canyon is not an initial dehydrator, but is a processing facility, as those terms are used in Wyo. Stat. Ann. § 39–14–203(b)(iv).

[¶ 48] The second useful principle of statutory construction is this:

> In ascertaining the legislative intent in enacting a statute ... the court ... must look to the mischief the act was intended to cure, the historical setting surrounding its enactment, the public policy of the

state, the conditions of the law and all other prior and contemporaneous facts and circumstances that would enable the court intelligently to determine the intention of the lawmaking body.

*Qwest,* ¶ 8, 130 P.3d at 511, quoting *Petroleum Inc. v. State Bd. of Equalization,* 983 P.2d 1237, 1240 (Wyo.1999). In the case before us now, the statute's historical setting and the general public policy regarding severance taxes provide helpful insight into what the legislature intended when it enacted the statute at issue.

[¶ 49] The severance tax is imposed at the point where "the production process is completed." Wyo. Stat. Ann. § 39–14–203(b)(ii). Historically, the term "production" refers to the severance of minerals from the ground. *State v. Pennzoil Co.,* 752 P.2d 975, 979 (Wyo.1988). Accordingly, the severance tax was traditionally imposed on the value of the mineral at the point where it is severed from the ground. *Petra Energy, Inc. v. Department of Revenue,* 6 P.3d 1267, 1271 (Wyo.2000). For natural gas, severance is generally considered to occur at the wellhead. *See Union Pac. Resources Co.,* 839 P.2d at 360–61. Accordingly, it has been said that the "basic concept" of the severance tax "is valuation at the wellhead." *J. Ray McDermott & Co. v. Hudson,* 370 P.2d 364, 367 (Wyo.1962). The legislature may choose to adjust or clarify the precise point of valuation, and over the years it has enacted legislation to do that. But unless the statute includes a clear expression of legislative intent to shift the point of valuation away from the wellhead, the statutory language should be construed to conform as nearly as possible to the basic severance tax concept of valuation at the wellhead.

[¶ 50] The Black Canyon facility is separated, physically and functionally, from the wellheads of the LaBarge Project. It does not play a part in removing the gas from the ground, but instead in handling the gas after it has been removed from the ground and gathered at the Black Canyon facility. On this basis, it seems inappropriate to consider Black Canyon, as the Department urges, as part of the production process like a typical, small, Type 1 dehydrator. It seems more appropriate to consider Black Canyon, as ExxonMobil urges, to be part of the post-production operations, more akin to the larger and more complex Type 2 dehydrators. ExxonMobil's position in this litigation places the point of valuation closer to the wellheads, while the Department's position pushes it further downstream. Absent a clear expression of legislative intent to depart from the basic severance tax concept of valuation at the wellhead, we must construe the statute in harmony with that concept. Based on these considerations, our construction of Wyo. Stat. Ann. § 39–14–203(b)(iv) must be that the legislature's intent was not to classify Black Canyon as an initial dehydrator as that term is used in the first sentence, but rather to consider Black Canyon a processing facility as that term is used in the second sentence of the statute.

[¶ 51] Based on both of these principles of statutory construction, we are ultimately persuaded that Wyo. Stat. Ann. § 39–14–203(b)(iv) must be construed as urged by ExxonMobil. We therefore determine that ExxonMobil's Black Canyon is not an "initial dehydrator," as that term is used in the first sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv), and the correct point of valuation for severance taxes is not the outlet of the Black Canyon facility. Black Canyon is instead a "processing facility" as that term is used in the second sentence of the statute, and the proper point of valuation is "at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first."

[¶ 52] ExxonMobil urges us to choose among these three options. It asserts that there is a custody transfer meter located at each wellhead, so the proper point of valuation is at the inlet to these custody transfer meters. The record before us, however, does not establish with sufficient certainty whether those meters are custody transfer meters or volume meters. If they are volume meters, they are not the proper points of valuation. *See Amoco Prod. Co.,* ¶ 31, 94 P.3d at 443. We are unable to resolve this issue based on the record before us, and will remand this case to the Board to

determine the correct point of valuation in accordance with this opinion.

## Issue II. Proportionate Profits Method

■ [¶ 53] As discussed above, severance taxes are levied on the value of the natural gas at the point where "the production process is completed." Wyo. Stat. Ann. § 39–14–203(b)(ii). The gas from the LaBarge Project is not sold at that point. Instead, ExxonMobil sells it after the gas has been processed and separated into products including methane, carbon dioxide, and sulfur. The amount ExxonMobil actually receives when it sells those products represents their higher value after processing and separation. An accounting method must be used to reduce the amount ExxonMobil actually receives for the products to reflect the lower value at the point where the production process is completed.

[¶ 54] The method chosen by the Department for calculating the value of ExxonMobil's 2005 production is the proportionate profits method set forth in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D):

Proportionate profits—The fair market value is:

(I) The total amount received from the sale of the minerals minus exempt royalties, nonexempt royalties and production taxes times the quotient of the direct cost of producing the minerals divided by the direct cost of producing, processing and transporting the minerals; plus

(II) Nonexempt royalties and production taxes.

A much-simplified example can illustrate how the proportionate profits method works. A company sells its natural gas for $100, which is, in the words of the statute, the "total amount received from the sale of the minerals." The "direct cost of producing the minerals" is $30. The "direct cost of producing, processing and transporting the minerals" is $50. Applying the statutory formula, the "fair market value" is calculated as follows: $100 × ($30 ÷ $50) = $60. This establishes the value of the natural gas at the time production was completed as $60, and the severance tax would be levied on this amount.

[¶ 55] In its order, the Board provided this broad explanation of how the proportionate profits method applies to ExxonMobil:

Under Wyoming law, the fair market value of natural gas production is determined at the point when the production process has been completed. Wyo. Stat. [Ann. § ] 39–2–208(a). The LaBarge raw gas stream, however, must undergo extensive processing in order to have marketable products. For this reason the amount received from the sale of the products from the raw gas stream reflects the value of those products after both production and processing. In order to determine the value of the products after production only, it is necessary to deduct from the total amount received from the sale an amount reflecting the value added to the products by processing. The purpose of the direct cost ratio in the proportionate profits methodology is to allocate "a portion of a taxpayer's revenue to non-taxable functions, i.e. processing and transporting." RME Petroleum Company v. Wyoming Department of Revenue, 2007 WY 16, ¶ 51, 150 P.3d 673, 691 (Wyo.2007).

[¶ 56] The dispute between the Department and ExxonMobil concerns the costs ExxonMobil incurs in transporting methane, carbon dioxide, and sulfur products to their respective points of sale after they have been processed and separated from the natural gas stream. The parties agree that post-processing transportation costs must be factored into the calculation, but disagree about how that should be done. The Department subtracted the post-processing transportation costs from the "total amount received from the sale of the minerals." ExxonMobil contends that this is contrary to the statutory formula, and that post-processing transportation costs must instead be included in the denominator of the direct cost ratio.

[¶ 57] The Department maintains that the result of including the post-processing transportation costs in the direct cost ratio is a compelling reason to reject ExxonMobil's position. The post-processing transportation costs are particularly high for carbon dioxide, because it must be compressed and sent long distances through pipelines to the eventual

points of sale. The Department points out that including the post-processing transportation costs for carbon dioxide "reduced taxable value for the gas stream to such an extent that *not taxing [carbon dioxide] at all generated a higher taxable value in the remaining minerals taxed.*" (Emphasis supplied by the Department.) The Department claims that this is an absurd result that should be avoided when interpreting the statute. *See Chevron U.S.A., Inc. v. Department of Revenue,* 2007 WY 43, ¶ 18, 154 P.3d 331, 337 (Wyo.2007).

[¶ 58] We disagree that this result is absurd. Severance taxes are levied on the "fair market value" of the mineral "after the production process is completed." Wyo. Stat. Ann. § 39–14–203(b)(ii). If it is unusually expensive to transport a mineral from the point of production to the point of sale, then that mineral has a lower fair market value at the point of production. More specifically, if the carbon dioxide component of the LaBarge raw gas stream is extremely expensive to transport, then the value of the carbon dioxide at the point of production is correspondingly low. If the value of the carbon dioxide is low, that reduces the value of the entire gas stream at the point of production. In fact, as we have previously observed, when natural gas prices are particularly low, the LaBarge gas stream may have "zero taxable value" under some accounting methods. *See Wyoming Dep't of Revenue v. Exxon Mobil Corp.,* 2007 WY 21, ¶ 3, 150 P.3d 1216, 1218 (Wyo.2007).

[¶ 59] The statutory formula for the proportionate profits method explicitly includes the "direct cost of producing, processing and transporting the minerals" in the denominator of the direct cost ratio. Wyo. Stat. Ann. § 39–14–203(b)(vi)(D). The use of the plural, "minerals," indicates that the transportation costs for all components of the raw gas stream must be included in the formula. The statute does not allow the Department to include the direct costs of some minerals and exclude the direct costs of others. While the Department may be correct that including the high costs of post-processing transportation for carbon dioxide results in a lower taxable value for the entire gas stream, that result is not absurd but rather a reflection of the true market value of the LaBarge gas stream at the point of production. The result is entirely consistent with the mandate of the Wyoming Constitution that "the product of all mines shall be taxed in proportion to the value thereof." Wyo. Const. art. 15, § 3.

[¶ 60] The Department asserts that post-processing transportation costs are not included in the direct cost ratio because they are incurred to transport the separate products of the gas stream rather than the collective gas stream. The Board agreed with this contention:

When individual mineral products are separated through processing as defined by statute, the producer may incur post-plant costs for transporting that particular mineral product to the point of sale. Those costs do not proportionately enhance the value of the other mineral products. Post-plant transportation costs thus bear no relevance to the value added by processing, and, therefore, do not belong in the direct cost ratio.

[¶ 61] However, Wyo. Stat. Ann. § 39–14–201(a)(xv) explicitly provides that, "For the purposes of taxation, the term natural gas includes products separated for sale or distribution during processing of the natural gas stream including, but not limited to plant condensate, natural gas liquids and sulfur." Methane, carbon dioxide, and sulfur are all products separated from the LaBarge Project natural gas stream, and all are included within the definition of natural gas for purposes of taxation. Because the Department levies taxes on the value of each individual product, it must also consider the costs of transporting each individual product.

[¶ 62] The key to resolving this dispute, we believe, is to determine whether post-processing transportation costs are part of the "direct cost of producing, processing and transporting the minerals." If so, then Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) directs that they be included in the denominator of the direct cost ratio. This is the position taken by ExxonMobil. The position taken by the Department, though never expressly stated this way, is that post-processing transporta-

tion costs are indirect costs. The Department's regulations provide this definition of direct costs:

"Direct costs of producing, processing and transporting" includes the direct cost of producing ... plus transportation and processing plant or facility labor whose primary purpose is transporting or processing crude oil, plant condensate, natural gas and other mineral products removed from the production stream; materials and supplies used for transporting and processing; depreciation expense for equipment used for transportation and processing; fuel, power and other utilities used for transportation and processing and maintenance of the transporting and processing plant or facilities; transportation from the point of valuation to the processing plant or facility to the extent included in the price and provided by the producer; ad valorem taxes on the transporting equipment and processing plant or facility; and any other direct costs incurred that are specifically attributable to the transporting or processing of mineral products contained in the production stream.

Department of Revenue Rules, ch. 6, § 4b(x). The Department contends that because the definition of direct costs expressly includes the costs of "transportation from the point of valuation to the processing plant or facility," it impliedly excludes costs incurred after the processing plant or facility.

[¶ 63] The Department has overlooked another phrase in this regulation, which states that direct costs include "any other direct costs incurred that are specifically attributable to the transporting or processing of mineral products contained in the production stream." Post-processing transportation costs are specifically attributable to transporting the methane, carbon dioxide, and sulfur products contained in the gas stream. This provision of the regulation substantially undermines the Department's position that post-processing transportation costs are not direct costs.

[¶ 64] The statutes and regulations provide no definition of the term "indirect costs" as applied to natural gas. As applied to coal, however, indirect costs are defined to include "allocations of corporate overhead, data processing costs, accounting, legal and clerical costs, and other general and administrative costs which cannot be specifically attributed to an operational function without allocation." Wyo. Stat. Ann. § 39–14–103(b)(vii)(D). Applying this statutory definition, we have observed that, for example, the costs of mining permits and environmental impact statements are indirect costs because they benefit the entire operation and cannot be specifically attributed to any coal mining or processing function. *Powder River Coal Co. v. Wyoming State Bd. of Equalization*, 2002 WY 5, ¶ 22, 38 P.3d 423, 430 (Wyo.2002). Although this statutory definition applies directly to coal, we also find it helpful in defining indirect costs of producing natural gas.

[¶ 65] The post-processing transportation costs for methane, carbon dioxide, and sulfur are not general administrative costs that benefit the entire project. They are directly attributable to the function of transporting those mineral products. Reading this statutory definition of indirect costs together with the regulatory definition of direct costs, we must conclude that post-processing transportation costs are not indirect costs, but direct costs. Accordingly, post-processing transportation costs must be included in the denominator of the statutory formula for calculating the fair market value of the minerals using the proportionate profits method.

[¶ 66] Even if these post-processing transportation costs were indirect costs, however, the Department has provided no case law support for the approach of subtracting them from total sales. In *Powder River*, ¶ 18, 38 P.3d at 429, we explained that "The proportionate profits method adopted by the legislature recognizes that indirect costs occur proportionately over all functions, production, processing, and transportation, in the same ratio as direct costs." Accordingly, Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) requires a calculation of the ratio of direct costs of production to the direct costs of production, processing, and transportation. It does not require a calculation of indirect costs in this formula, but instead presumes that indirect costs occur in the same ratio as direct costs. The statutory

formula, as interpreted in Powder River, does not mention indirect costs, and therefore cannot be interpreted to authorize the Department's approach of subtracting indirect costs from total sales.

[¶ 67] The Department has cited no statutory or regulatory authority for its approach of subtracting post-processing transportation costs directly from the amount received in sales. The applicable statute, Wyo. Stat. Ann. § 39–14–203(b)(vi)(D), is explicit about what is included in this step of the formula: "The total amount received from the sale of the minerals minus exempt royalties, nonexempt royalties and production taxes." It does not indicate, in any way, that post-processing transportation costs are also subtracted from the sales amount.

■ [¶ 68] For all of these reasons, we conclude that Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) is unambiguous on the correct way to account for post-processing transportation costs. Post-processing transportation costs are "direct cost[s] of producing, processing and transporting the minerals." They must therefore be included in the denominator of the direct cost ratio under the proportionate profits method.

### CONCLUSION

[¶ 69] On both issues in this appeal, we reverse the Board's decisions, and remand to the district court for further proceedings consistent with this opinion.

HILL, Justice, dissenting.

[¶ 70] I respectfully dissent because I conclude that the majority opinion accords neither the Department of Revenue (DOR) nor the Board of Equalization (BOE) the full benefit of the applicable standards of review. Neither does it apply a complete statement of the applicable principles of statutory construction for revenue statutes such as those at issue here.

[¶ 71] It is my view that the heart of this controversy is best understood if the following circumstances are noted at the commencement of our discussion. The fair market value of natural gas for severance and ad valorem tax purposes is determined "after the production process is completed." Wyo. Stat. Ann. § 39–14–203(b)(ii) (LexisNexis 2009). Wyo. Stat. Ann. § 39–14–203(b)(iv) provides:

The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs **before the outlet of the initial dehydrator**. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first[.] [Emphasis added.]

[¶ 72] Determining the point of valuation is of particular significance because "expenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the [natural gas]." Wyo. Stat. Ann. § 39–14–203(b)(ii). Thus, because certain expenses "downstream" of the point of valuation *are* deductible, it is to the producer's benefit to have the point of valuation determined "upstream" as far as possible. That is the instant case in a nutshell. Here Exxon seeks an "upstream" point of valuation instead of the "downstream" point of valuation determined by the DOR and confirmed by the BOE. See *Williams Production RMT Co. v. State Dept. of Revenue*, 2005 WY 28, ¶¶ 9–10, 107 P.3d 179, 183–84 (Wyo.2005).

[¶ 73] The majority concludes that these words in § 39–14–203(b)(iv) are ambiguous:

**§ 39–14–203. Imposition.**

. . . .

(b) Basis of tax. The following shall apply:

. . . .

(iv) The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the **initial dehydrator**. When no dehydration is performed, other than within a **processing facility**, the production process is completed at the inlet to the initial transportation related compressor,

custody transfer meter or processing facility, whichever occurs first;

The majority begins its analysis by reciting the standard of review we apply in matters adjudicated under the Administrative Procedures Act. See Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2009) and *Dale v. S & S Builders*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo.2008). I include the entire statement of that standard of review because that cited by the majority is incomplete and, perhaps, just a bit misleading:

Thus, in the interests of simplifying the process of identifying the correct standard of review and bringing our approach closer to the original use of the two standards, we hold that henceforth the substantial evidence standard will be applied any time we review an evidentiary ruling. When the burdened party prevailed before the agency, we will determine if substantial evidence exists to support the finding for that party by considering whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. See, *Wyo. Consumer Group v. Public Serv. Comm'n of Wyo.*, 882 P.2d 858, 860–61 (Wyo.1994); *Spiegel*, 549 P.2d at 1178 (discussing the definition of substantial evidence as "contrary to the overwhelming weight of the evidence"). If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it. [Emphasis added.]

Questions of law are reviewed *de novo*. *Id.* at ¶ 26, 188 P.3d 561–62. The majority bypasses the substantial evidence part of this standard of review by characterizing the issue here as one of "statutory construction" and, thus, a pure question of law. The core of my dissent, in this regard, centers on the circumstance that we historically have applied a much more complex standard of review when addressing decisions made by the BOE. This is so because it exercises a unique role under the Wyoming Constitution and statutes. Wyo. Const. art. 15, § 10; Wyo. Stat. Ann. § 39–11–102.1 (LexisNexis 2009). The responsibilities assigned to the BOE include:

**§ 39–11–102.1. Administration; state board of equalization.**

. . . .

(iv) Decide all questions that arise with reference to the construction of any statute affecting the assessment, levy and collection of taxes, in accordance with the rules, regulations, orders and instructions prescribed by the department [of revenue]:

(A) Upon application of any person adversely affected; or

(B) In performing its responsibilities to equalize values, including with respect to the suitability of the system prescribed by the department for establishing fair market value.

Wyo. Stat. Ann. § 39–11–102.1(c)(iv).

[¶ 75] The following constitutes one of the expanded standards of review we have applied when considering decisions rendered by the DOR and/or the BOE:

With regard specifically to valuations of property by DOR for purposes of taxation, we have recently noted:

The Department's valuations for state-assessed property are presumed valid, accurate, and correct. This presumption can only be overcome by credible evidence to the contrary. In the absence of evidence to the contrary, we presume that the officials charged with establishing value exercised honest judgment in accordance with the applicable rules, regulations, and other directives that have passed public scrutiny, either

through legislative enactment or agency rule-making, or both.

The petitioner has the initial burden to present sufficient credible evidence to overcome the presumption, and a mere difference of opinion as to value is not sufficient. If the petitioner successfully overcomes the presumption, then the Board is required to equally weigh the evidence of all parties and measure it against the appropriate burden of proof. Once the presumption is successfully overcome, the burden of going forward shifts to the DOR to defend its valuation. The petitioner, however, by challenging the valuation, bears the ultimate burden of persuasion to prove by a preponderance of the evidence that the valuation was not derived in accordance with the required constitutional and statutory requirements for valuing state-assessed property.

Moreover, in examining the propriety of the valuation method, our task is not to determine which of the various appraisal methods is best or most accurately estimates fair market value; rather, it is to determine whether substantial evidence exists to support usage of the chosen method of appraisal.

*Colorado Interstate Gas Company v. Wyoming Department of Revenue*, 2001 WY 34, ¶¶ 9–11, 20 P.3d 528, ¶¶ 9–11 (Wyo. 2001) (citations omitted).

*Airtouch Communications, Inc. v. Department of Revenue, State of Wyo.*, 2003 WY 114, ¶ 12, 76 P.3d 342, 348 (Wyo.2003); *Amoco Production Co. v. Dept. of Revenue*, 2004 WY 89, ¶¶ 7–8, 94 P.3d 430, 435–36 (Wyo. 2004).

[¶ 76] I accept and acknowledge that when it comes to the construction of statutes this Court has the last word. Ordinarily, however, we defer to the construction espoused by the DOR and BOE unless it is **contrary** to the words of the governing statutes at issue:

In determining whether these statutes are ambiguous it is helpful to note the construction the Department placed on the statutes which it is charged with administering. This Court has previously held that an agency's interpretation of the statutory language which the agency normally implements is entitled to deference, unless clearly erroneous. *Buehner Block Co. v. Wyo. Dep't of Revenue*, 2006 WY 90, ¶ 11, 139 P.3d 1150, 1153 (Wyo.2006). Moreover, this Court generally defers to the construction placed on a statute by the agency that is charged with its execution, provided that construction does not conflict with the legislature's intent. *Qwest*, ¶ 8, 130 P.3d at 511; see also *Loberg v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2004 WY 48, ¶ 9, 88 P.3d 1045, 1049 (Wyo.2004) (one measure of a statute's meaning is the interpretation placed on it by the agency charged with its administration); *State ex rel. Sublette County Bd. of County Comm'rs v. State*, 2001 WY 91, ¶ 16, 33 P.3d 107, 113 (Wyo.2001).

*Wyoming Dept. of Revenue v. Exxon Mobil Corp.*, 2007 WY 112, ¶ 31, 162 P.3d 515, 526 (Wyo.2007). Many jurisdictions afford much greater deference to constructions placed on statutes by administrative bodies, especially in matters involving revenue and taxation. As a general rule, because of the complexity of taxation issues, significant deference is given to a body such as the BOE. 3A Norman J. Singer, *Statutes and Statutory Construction*, § 66:4 (Effect of administrative interpretation) (6th ed. 2003); and see *Airtouch Communications*, ¶ 13, 76 P.3d at 348 ("Further, in part because of the complex nature of taxation, we have found there is a presumption the assessment was done correctly by DOR acting in its official capacity."); also see *State v. Hanover Compression, LP*, 2008 WY 138, ¶¶ 8–15, 196 P.3d 781, 784–87 (Wyo.2008). I reject the majority's conclusion that because the industry and the DOR have different views as to what an "initial dehydrator" and a "processing facility" are that the statute is, therefore, ambiguous and this Court is at liberty to resolve the difference of opinion between DOR and Exxon. My examination of the findings of the BOE, especially ¶¶ 77–85, convinces me that the DOR correctly identified the Black Canyon facility as an "initial dehydrator," even though it may also perform some other miscellaneous functions.

[¶ 77] The majority also employs a very general rule to the effect that revenue statutes must be strictly construed in favor of the taxpayer. We have applied this general principle frequently over the years, but seldom has our analysis exceeded the most simplistic application of that aphorism. See 3A Norman J. Singer, *Statutes and Statutory Construction, supra,* § 66:1 (Strict construction of statutes creating taxes). However, the continuation of that commonly cited rule is this:

> But the revenue legislation must also be reasonably construed so that their underlying purpose is not destroyed. Where an interpretation places undue importance on words subordinate to the plainly apparent objective of a statute in order to reward persons who resort to some unusual or not reasonably to be expected procedure, the court should not accept that interpretation. It should be remembered that when a tax statute is clear and unambiguous there is no necessity to apply the rules of strict construction.

[¶ 78] 3A Norman J. Singer, *Statutes and Statutory Construction, supra,* § 66:2 (Reasonable construction of revenue laws) posits this more temperate view of the construction of revenue statutes:

> The long range objective of all tax measures is to promote a stable social order by providing financial support to cover the expenses of the government and its programs. Although different forms of taxation may sometimes produce individual hardships, an overly biased interpretation of tax laws for the benefit of the taxpayer may result in the loss of revenue at the expense of the government and operate to the disadvantage of others contributing to its support. Furthermore, no other field of legislation receives as much attention. There are frequent amendments and revisions that afford assurance that the statutes cover the subject fully and with precision. This means that courts do not spend as much time interpreting tax legislation as one might anticipate. Because of this, a reasonable construction of tax statutes, i.e., a construction so conditioned by an *a priori* bias against collectibility of the tax has sometimes been preferred.

As stated by one court: "The better rule, and the one we adopt, is that statutes imposing taxes and providing means for the collection of the same should be construed strictly in so far as they may operate to deprive the citizen of his property by summary proceedings or to impose penalties or forfeitures upon him; but otherwise tax laws ought to be given a reasonable construction, without bias or prejudice against either the taxpayer or the state, in order to carry out the intention of the legislature and further the important public interests which such statutes subserve."

[¶ 79] I am unable to agree that, in the light of modern views of revenue laws, the somewhat antiquated principle of construing tax legislation strictly in favor of the taxpayer plays a significant role in circumstances such as these. Exxon is easily one of the most sophisticated taxpayers on Earth and Wyoming is likely one of the very smallest revenue collectors that Exxon has to deal with in its efforts to avoid taxation.

[¶ 80] Finally, I do not agree with the majority's conclusion that the DOR and the BOE applied the proportionate profits method incorrectly. In this regard, I rely on the findings of the BOE order, ¶¶ 141–147 and 187–210.

[¶ 81] For the reasons set out above, I would affirm the BOE's order.