**AMOCO PRODUCTION COMPANY, a Delaware corporation and Exxon Corporation, a New Jersey corporation, and Chevron U.S.A. Inc., a Pennsylvania corporation, Appellants (Plaintiffs),**

v.

**STATE of Wyoming, State Board of Equalization and its members Tom Trowbridge, Shirley Whittler, and Carroll Orrison in their official capacities; and the Department of Revenue and Taxation, Appellees (Defendants).**

No. 87–231.

Supreme Court of Wyoming.

March 9, 1988.

Marilyn S. Kite (argued) and Lawrence J. Wolfe of Holland & Hart, Cheyenne, for appellants Amoco and Exxon, and William J. Thomson, II (argued) of Dray, Madison & Thomson, Cheyenne, for appellant Chevron.

Joseph B. Meyer, Atty. Gen., and Michael L. Hubbard (argued) Sr. Asst. Atty. Gen., for appellees.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

This was a declaratory judgment action in which each of the parties moved for

summary judgment. The summary judgment motion of appellants, Amoco, Exxon and Chevron was denied, and the summary judgment motion of appellee, State of Wyoming was granted, the court declaring the severance tax upon non-hydrocarbon gases to be six percent of the value of the gross product extracted. This appeal is from the summary judgment in favor of appellee, State of Wyoming.

The single issue presented for our determination, as stated by appellants, is:

"Can the State, by interpretation, extend the severance taxes on 'natural gas' and 'oil and gas' to all gaseous minerals?"

and, as stated by appellee:

"Did the district court properly grant the State's motion for summary judgment in that there were no genuine issues of material fact and as a matter of law W.S. § 39–6–302 imposes a six percent excise tax upon the privilege of severing or extracting non-hydrocarbon gases, such as carbon dioxide, hydrogen sulfide, helium, nitrogen, etc.?"

We affirm.

Appellate review of summary judgment requires that we examine the judgment in the same light as the district court, using the same material and information as was before the district court, to determine whether summary judgment is appropriate. *Kobielusz v. Wilson*, Wyo., 701 P.2d 559 (1985). Summary judgment is appropriate only if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56, W.R.C.P. The facts in this case are not in dispute. The question presented is one of law involving only the interpretation of our statute imposing an excise tax upon the privilege of severing and extracting valuable deposits.

Appellants, Amoco, Exxon, and Chevron have long been engaged in leasing, exploring for, drilling, developing, producing, and marketing oil and gas in the State of Wyoming. The gas stream produced from wells in Wyoming generally consists of varying percentages of hydrocarbons and one or more of such non-hydrocarbons as carbon dioxide ($CO_2$), hydrogen sulphide

($H_2S$), nitrogen (N) and helium (He). In 1983, the Wyoming Oil and Gas Conservation Commission permitted Exxon to vent $CO_2$ produced in the LaBarge project into the atmosphere. That was because prior to 1986, except for $H_2S$, the non-hydrocarbon gases had no commercial value and were separated from the hydrocarbon gases and wasted. Prior to 1986, when $H_2S$ was separated from the produced gas, reduced to raw sulphur, marketed, and sold, an excise tax in the amount of six percent was assessed by the State of Wyoming and paid without protest. Commencing with the first quarter in 1986, Amoco and Chevron, for the first time, paid the six percent severance tax on non-hydrocarbon gas under protest, and Exxon filed a statement of opposition to the six percent severance tax with the Board of Equalization.

Also in 1986, Exxon's LaBarge project in southwest Wyoming was producing a gas stream consisting of approximately 66% $CO_2$, 22% methane, 4% $H_2S$, 8% nitrogen and other inert gases. The $CO_2$ gas now had commercial value and was being marketed and sold to Chevron and Amoco for use in tertiary oil recovery in the Rangely Field in Colorado and in the Lost Soldier and Wertz fields in Carbon and Sweetwater counties, Wyoming. The State of Wyoming contends that the correct excise tax upon the privilege of severing or extracting $CO_2$ gas is six percent. Appellants contend that $CO_2$ is not natural gas, that the correct tax is two percent, and that they should have a refund of tax paid of more than $615,000.

Subsections (a), (b), and (g) of § 39–6–302, W.S.1977, provide for this excise tax as follows:

"(a) Except as otherwise provided in subsection (h) of this section, *there is levied an excise tax of two percent (2%) of the value of* the gross product extracted upon the privilege of severing or extracting uranium, trona, coal except underground coal, petroleum, *natural gas,* oil shale or any other fossil fuel in the state.
* * *

"(b) Except as otherwise provided in subsection (h) of this section, *in addition* to

the excise tax imposed by subsection (a) of this section *there is levied an excise tax of two percent (2%) of the value of the gross product extracted upon the privilege of severing or extracting any valuable deposit* in the state except stripper production and underground coal. * * *

* * * * * *

"(g) Except as otherwise provided in subsection (h) of this section, *in addition* to other excise taxes provided by this section *there is levied a tax of two percent (2%) of the value of* the gross product extracted upon the privilege of severing or extracting oil and *gas*." (Emphasis added.)

The parties agree that the term "any valuable deposit" as used in subparagraph (b) of the statute includes the $CO_2$ gas being marketed and sold and that the 2% excise tax was correctly levied. They disagree upon whether the term "natural gas" in subparagraph (a) and "gas" in subparagraph (g) includes $CO_2$ gas.

■ Section 39–6–302, supra, provides for the levy of an excise tax upon "the value of the gross product extracted." The State suggests that "gross product" means anything of value produced from the well. We disagree. It is plain that gross product clearly refers to the specific minerals subsequently listed as "uranium, trona, coal except underground coal, petroleum, [and] natural gas" in subsection (a) and "gas" in subsection (g). The effect of the plain language of the statute is to tax the value of the total product, which in this case is gas and natural gas as used in § 39–6–302.

We discuss first the meaning of the term "gas" as used in subparagraph (g) of § 39–6–302. We initially look to determine whether the language of the statute is plain and unambiguous or whether it is of doubtful meaning. A statute that is

"clear and unambiguous on its face, need not and cannot be interpreted by a court and * * * only statutes which are of doubtful meaning are subject to the process of statutory interpretation." 2A Sutherland Statutory Construction § 45.02 (1984 Rev'n).

"[T]he meaning of the statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, * * * the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

If the language of the statute is clear and unambiguous, we do not resort to rules of statutory construction, nor search out another meaning for the words used. *Amoco Production Company v. Hakala,* Wyo., 644 P.2d 785 (1982). Words in a statute will be given their plain and ordinary meaning. *State Board of Equalization v. Tenneco Oil Company,* Wyo., 694 P.2d 97 (1985). A statute is ambiguous if its meaning is uncertain, doubtful, or if a single term can fairly be said to mean different things. 73 Am.Jur.2d Statutes § 195 at 392 (1974).

■ It was claimed in *Northern Natural Gas Company v. Grounds,* 441 F.2d 704 (10th Cir.1971), that because "gas" followed "oil" in the document leasing "oil and gas," the rule of ejusdem generis applied, the meaning of "gas" was restricted by the word "oil" and included, therefore, only hydrocarbons. The argument was rejected, the court holding the word gas was effective to grant to lessee hydrocarbons and helium, a non-hydrocarbon. By analogy, we might conjecture that if this were litigation over whether the word gas in appellants' lease included just hydrocarbons, appellants surely would be taking an opposite position urging that the word gas included both hydrocarbons and non-hydrocarbons such as $CO_2$—otherwise they would have no title or right to produce and market $CO_2$. The State suggests that appellants, by taking inconsistent positions, are hunting with the hounds and running with the foxes; but we think the correct statement of the proverb is to "hold with the hare and run with the hounds."

Appellants in their brief acknowledge that

"while standing alone, the term 'gas' can encompass non-hydrocarbon gas, hydro-

carbon gas or a mixture of both (Cf., 30 U.S.C. § 181); the same is not true for 'natural gas' which has always meant gaseous hydrocarbons."

We agree and construe the word gas in the statute as standing alone, identifying no particular gas but encompassing all gas. By definition, included are:

Carbon dioxide: "a heavy colorless gas $CO_2$ that does not support combustion, dissolves in water to form carbonic acid * * *." Webster's Ninth New Collegiate Dictionary (1987).

Hydrogen sulfide: "a flammable poisonous gas $H_2S$ that has an odor suggestive of rotten eggs and is found esp. in many mineral waters and in putrefying matter." Id.

Helium: "a light colorless non-flammable gaseous element found esp. in natural gases and used chiefly for inflating airships and balloons, for filling incandescent lamps, and for. cryogenic research." Id.

Nitrogen: "a colorless tasteless odorless gaseous element that constitutes 78 percent of the atmosphere by volume and occurs as a constituent of all living tissues in combined form." Id.

Methane: "a colorless odorless flammable gaseous hydrocarbon $CH_4$ that is * * * used as a fuel and raw material in chemical synthesis." Id.

Propane: "a heavy flammable gaseous paraffin hydrocarbon $C_3H_8$ found in crude petroleum and natural gas and used esp. as fuel and in chemical synthesis." Id.

There is no ambiguity in the meaning of the term "gas." It is a common word in general usage. Gas is defined as "a fluid (as air) that has neither independent shape nor volume but tends to expand indefinitely." Id. All of the above are gases and, as such, are subject to the two percent excise tax upon the value of the gross product extracted.

The primary thrust of appellants' argument in this case is that the word "natural gas," used in subparagraph (a) of § 39–6–302, identifying the gross product extracted, refers to the combustible hydro-carbon gases only. Thus appellants, in their brief, state:

"Ask people on the street to say what natural gas means, and they will tell you it is the gas that they use to heat their water, fire their furnace, or cook their food. Words such as gas furnace, gas stove, gas heater, natural gas pipeline, natural gas industry, are ordinary uses of the term that connotes a hydrocarbon fuel used for heat and energy."

Appellee State of Wyoming says:

"The term 'natural gas' simply refers to the naturally occurring mixture of hydrocarbon and non-hydrocarbon gases issuing from the earth's crust through natural openings or bored wells. As used in its plain, ordinary and everyday sense the term 'natural gas' refers to the total mixture of hydrocarbon and non-hydrocarbon gases produced at the well."

It is said that the term "natural gas" fairly and reasonably has more than one meaning, that therefore it is ambiguous, and we must ascertain which gases the legislature intended to be the subject of levy of excise or severance tax. Appellants contend that the legislature intended to tax what is commonly understood by average persons to be natural gas, i.e., fuel used to heat, cook, and provide energy. The State, contending that the legislature used the term natural gas in its technical sense, defined it as

"[a] gas issuing from the earth's crust through natural openings or bored wells and frequently accompanied by petroleum. It occurs especially in the Palezoic rocks of the United States, and is of industrial importance in more than a dozen states. When combustible it consists of methane with small and variable amounts of ethane, propane, butane, hydrogen, oxides of carbon, nitrogen, helium, hydrogen sulfide, etc." Webster's New International Dictionary of the English Language, Unabridged (2d ed. 1956).

■ The great weight of authority compels us to the conclusion that the legislature used the word natural gas in its technical sense, and that the most sensible and appropriate resolution of this question is

that the legislature intended natural gas to include all gases that occur naturally in gas produced from drilled wells.

If a word in a statute has a usual meaning and a technical meaning, the technical meaning is preferred as stated in § 8–1–103 W.S.1977, Cum.Supp.1987, which provides:

"(a) The construction of all statutes of this state shall be by the following rules, unless that construction is plainly contrary to the intent of the legislature: "(i) Words and phrases shall be taken in their ordinary and usual sense, but *technical words* and phrases having a peculiar and appropriate meaning in law *shall be understood according to their technical import.*" (Emphasis added.)

Some of the technical publications define natural gas as follows:

"Natural gas is defined as a naturally occurring mixture of hydrocarbon and nonhydrocarbon gases found in the porous geologic formations beneath the earth's surface, often in association with petroleum. To obtain a marketable product, the raw natural gas flowing from gas or oil wells must be processed to remove water vapor, inert or poisonous constituents, and condensible hydrocarbons. The processed gas is principally methane, with small amounts of ethane, propane, butane, pentane, carbon dioxide, and nitrogen * * *." 11 Kirk–Othmer Encyclopedia of Chemical Technology 630 (3rd ed. 1980).

"Natural gas is defined as a mixture of hydrocarbon compounds and small quantities of various nonhydrocarbons existing in the gaseous phase or in solution with oil in natural underground reservoirs at reservoir conditions * * *." Standard Definitions for Petroleum Statistics, Technical Report No. 1, (3rd ed.) (published by the American Petroleum Institute).

Appellant Exxon's LaBarge project manager, testifying before the Wyoming Industrial Siting Council, stated:

"Q. I wonder, could you define for me in a textbook fashion, if you could, natural gas?

"A. Sure. Natural gas is any gas that's naturally produced from a well."

The technical meaning of natural gas includes both hydrocarbons and non-hydrocarbons.

Decided cases are in accord with applying the technical meaning. In *Lone Star Gas Company v. Stine*, Tex.Com.App., 41 S.W.2d 48, 49, 82 A.L.R. 1299 (1931), the Texas Commission of Appeals, in considering whether gasoline produced from natural gas from a well was included in the natural gas, stated:

"The term 'all natural gas' would include all the substances that come from the well as gas, and that regardless of whether such gas be wet or dry. It is undisputed in the evidence that the term 'natural gas' includes numerous elements or component parts, but the very language of the conveyance is such as to include therein all these component parts which were in gaseous form when they came from the wells."

In *Navajo Tribe of Indians v. United States*, 364 F.2d 320, 326 (1966), the Court of Claims, in considering whether helium was part of the gas deposit that passed to the lessee, stated:

"Although the parties to the lease may have been thinking mainly of fuel-type gases, it is still more realistic to presume that the grant included not only hydrocarbons but the other gaseous elements as well. It follows that, whether its percentage was high or low, the helium component was part of the 'gas deposit' which passed to the lessee. This conclusion is consistent with what we have determined to be the general intent of the original lessor and lessee."

*Northern Natural Gas Company v. Grounds*, supra, 441 F.2d 704, resolved the question whether helium was included in the lease of gas by applying the general intent of the parties to the lease rather than their specific intent. The trial court concluded that

"in view of the circumstances of lease execution, the definition and usage of terms within the industry, and the intentions of the parties as disclosed by their

actions, the leases extend to the entire gas stream absent an express reservation, and helium passes thereunder unless expressly reserved." Id. at 714.

The appellate court agreed, stating:

"We believe that the issue is whether general or specific intent controls. The claimed general intent is lease coverage of all components of the gas produced by the wells. The specific intent is said to be lease coverage only of combustible gas. General intent includes helium and specific intent excludes it.

\* \* \* \* \* \*

"In our opinion general intent is closer to original intent than is specific intent which blossoms when a component previously regarded as an impurity becomes valuable." Id. at 714–15.

The above cases concern construction of leases of gas and natural gas and the intent of the parties to those leases. We are concerned with legislative intent in enacting a statute using the words natural gas rather than intent of parties to a lease agreement. The cases, nevertheless, are of substantial value as indicating the reasonable intent of the drafter of a statute or document who uses the words gas and natural gas.

Finally, when construing an ambiguous term in a statute, it is helpful to consider the historical setting at the time of enactment, public policy of the State, the purpose of the statute, and the mischief to be cured. Legislative intent is the primary and foremost consideration. *State Board of Equalization v. Tenneco Oil Company,* supra, 694 P.2d at 100. The purpose of the excise or severance tax was to tax depletable resources one time to provide funds to soften the impact of boom and bust which occurs with some frequency in energy states. During the boom, drilling rigs and mining equipment arrive, followed by a migration of drillers, pushers, rig hands, supervisors, construction workers, and service and support personnel. Trailer courts are full. New schools are built. New subdivisions are platted with streets, curbs, gutters and sewers, and new housing constructed. The strain on state and local government is enormous. Then the boom is over. Whatever is done to keep the energy companies in Wyoming is useless. They leave and, after a long painful period of time, the state again becomes an uncrowded, unspoiled, relaxed place to live with excellent fishing, hunting and recreation. The purpose of the severance tax is to provide funds to deal with the burdens placed upon the state during the boom and for readjustment when the boom is over. The reason to tax all valuable minerals could not be more clear, and surely no legislator would agree that there was an intent to exclude from tax all valuable gas except hydrocarbons. If that was the intent of the legislature, it could have easily restricted the words natural gas to hydrocarbons by use of express language in the statute.

Appellants rely heavily upon former Governor Hathaway's message in his 1974 "State of the State" address urging the legislature to enact a tax upon "energy fuels." It is claimed that these taxes were the direct result of the governor's request. Although relevant as historical setting at the time, the governor's request is not conclusive. We view it as a request to tax valuable resources. We observe also that often what comes from the legislature is something different than requested. That is as it should be, for no branch of government is a rubber stamp for the other.

The judgment of the district court is

Affirmed.