# IN THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 107

OCTOBER TERM, A.D. 2023

November 7, 2023

CHESAPEAKE OPERATING, LLC,

Appellant
(Petitioner),

v.

S-23-0036

STATE OF WYOMING,
DEPARTMENT OF REVENUE,

Appellee
(Respondent).

*W.R.A.P. 12.09(b) Certification*
*from the District Court of Converse County*
*The Honorable F. Scott Peasley, Judge*

***Representing Appellant:***
Walter F. Eggers III and Kasey J. Schlueter, Holland & Hart LLP, Cheyenne, Wyoming. Argument by Mr. Eggers.

***Representing Appellee:***
Bridget Hill, Wyoming Attorney General; Brandi Monger, Deputy Attorney General; Karl D. Anderson, Supervising Attorney General; James Peters, Senior Assistant Attorney General. Argument by Mr. Peters.

***Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.***

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    The Wyoming Departments of Audit and Revenue (Department) conducted a mineral tax audit of Chesapeake Operating, LLC's (Chesapeake) oil and gas production for the production years 2010-2012 and 2014-2016.  It issued audit assessments increasing the value of Chesapeake's production based on a point of valuation downstream from the custody transfer meters located near each wellhead.   Chesapeake disputed the Department's assessments and point of valuation.  The Board of Equalization (Board) affirmed.  Chesapeake appealed, arguing the Board erred in affirming the point of valuation because Chesapeake's field facilities were "processing facilit[ies]" under Wyo. Stat. Ann. § 39-14-203(b)(iv) and that the proper point of valuation for its gas production is at the custody transfer meters.  Pursuant to W.R.A.P. 12.09(b), the district court certified the case directly for this Court's review.  We affirm.

## ISSUE

[¶2]    The parties present a single issue for review:

> Did the State Board of Equalization misinterpret Wyo. Stat. Ann. § 39-14-203(b)(iv) when it found Chesapeake's facilities did not qualify as processing facilities?

## FACTS

[¶3]    The crux of this dispute is where Chesapeake's natural gas production stops and processing begins.  Under Wyoming's tax code, costs incurred in the production of oil and gas are not deductible from severance and ad valorem taxes, but costs incurred for processing are deductible.  *See* Wyo. Stat. Ann. § 39-14-203(b) (severance taxes); §§ 39-13-102(m)(i), 103(b)(iv) (ad valorem taxes).  Accordingly, the closer to the wellhead processing occurs, the more advantageous it is to the taxpayer.  *Williams Prod. RMT Co. v. State Dep't of Revenue*, 2005 WY 28, ¶ 10, 107 P.3d 179, 183–84 (Wyo. 2005).

[¶4]    Chesapeake produces oil and natural gas from horizontal wells in Converse County, Wyoming.  Initially, the gas was flared[1] and oil was sold out of storage tanks at the well pads.  Between 2010 and 2016, Chesapeake began selling the natural gas and expanded its production by drilling more wells.  Over this period, seven separately located facilities (referred to here as "the seven facilities" or "the facilities") were built to assist with the expanded operations.  These are known as the Pronghorn, Antelope, Gumbo Hill, No Name, Pale Horse, Rawhide, and Appaloosa facilities.  All seven facilities were essentially

---

[1] "Flaring" describes the process of burning "in an open flame in the open air . . . . Natural gas that is uneconomical for sale is . . . flared."  *Flare*, U.S. Energy Information Administration, https://www.eia.gov/tools/glossary/?id=natural%20gas (last visited Oct. 31, 2023).

identical to each other for the production years in question.  In these proceedings, the parties used the Rawhide facility as the exemplar for all seven facilities.

[¶5]    Chesapeake's production system is complex.  Oil and gas are extracted from the field using wells extending from well pads.  After extraction, a vertical separator near the wellhead separates liquids from gas.  Oil and water move to heater treaters.[2]  The heater treaters remove additional liquid from the gas and separate oil from water.  The water and oil are stored in tanks.  Key to this discussion, after separation at the wellhead, the gas passes through the custody transfer meter and is transported through a natural gas pipeline to one of the seven facilities.

[¶6]    Each of these facilities is large and includes multiple buildings.  They are fenced and occupy 12 acres of land.  They are monitored remotely, 24 hours a day, 7 days a week by the operators of the system, who are available to address any problems that might arise.  When the gas arrives at a facility, it first flows to separators where heavier condensate, oil, water, and other substances are removed.  From there, the liquids are piped to an onsite slug catcher[3] for further separation.  Heavier hydrocarbons are stored in tanks and ultimately sold.  The separated gas flows to compressors where gas is pressurized to meet pipeline specifications.  At the Rawhide facility there are ten compressors housed in two separate buildings.  The compressors increase the gas stream pressure from about 40 pounds per square inch (psi) to between 800 and 900 psi.  The gas then moves to the triethylene glycol (TEG) dehydrator[4] where water vapor is removed.[5]  Gas exits the TEG dehydrator and is moved through high pressure transport lines to one of two natural gas liquids (NGL) extraction facilities for processing and eventual sale.  The two NGL extraction facilities are the Tallgrass and Bucking Horse facilities.  The parties do not dispute that these facilities are processing facilities.

---

[2] A heater-treater is "commonly used in oilfield production processes . . . to separate water and other foreign substances from . . . crude oil."  Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms*, at 464 (15th ed. 2012).  When "temperature of the oil increases, the water and other contaminants separate from the oil and drop to the bottom of the heater.  The contaminants are discharged from the heater-treater and the crude oil, without contaminants," is stored for transport.  *Id.*

[3] Slug is an accumulation of liquid, for example condensed water, in a low point of a gas pipeline.  Slugs tend to accumulate when flow rate is low or interrupted.  A slug catcher is "[a]n installation designed to cause any condensed liquids in a gas line to separate from the gas."  Williams & Meyers, *supra*, at 976.

[4] "Dehydrators are used in the oil and gas industry to remove water from gas, to meet pipeline quality standards."  U.S. Environmental Protection Agency, *Glycol Dehydrators*, https://www.epa.gov/natural-gas-star-program/glycol-dehydrators (last visited Oct. 31, 2023).  The "desiccant most often utilized is triethylene glycol (TEG).  During the dehydration process, TEG absorbs water along with methane, volatile organic compounds (VOCs), and hazardous air pollutants (HAPs) when contacted with the wet gas."  *Id.*

[5] TEG recirculates from the TEG dehydrator to TEG regeneration equipment (which boils water out of the TEG solution so that the TEG may be reused) located in an adjacent building, and back to the TEG dehydrator, where it is used again to dehydrate the gas stream.

[¶7]    The Department audited Chesapeake's natural gas production for the years 2010-2012 and 2014-2016.  The Department first determined the point of valuation.  Wyoming statutes provide that the "fair market value for crude oil, lease condensate and natural gas shall be determined after the production process is completed . . . [and] expenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the mineral[.]"  Wyo. Stat. Ann. § 39-14-203(b)(ii) (LexisNexis 2023).  The Department concluded despite the functions described above, the seven facilities were production facilities and production was not complete until the natural gas left the TEG dehydrators.  It used the outlet of the TEG dehydrators as the point of valuation and determined Chesapeake owed an additional $872,838.14 severance tax and interest for the 2010-2012 production years and an additional $3,245,064.90 severance tax and interest for the 2014-2016 production years.

[¶8]    Chesapeake timely appealed to the Board.  Chesapeake argued that because the seven facilities are "processing facilities" as the term is used in the mineral tax statutes, production is complete when natural gas enters the custody transfer meter at the wellhead, prior to the arrival at one of the seven facilities.  It asserted the custody transfer meter is the point of valuation.  The Department stood by its position that the seven facilities are production facilities, and the point of valuation is at the outlet of the TEG dehydrator.  After a contested case hearing, the Board concluded the Department was correct and that Chesapeake had offered "no technical evidence" supporting its contention that the seven facilities were processing facilities.  Chesapeake appealed and the parties filed a joint motion asking that the case be certified to this Court.  This Court accepted certification on February 28, 2023.

### STANDARD OF REVIEW

[¶9]    "When an administrative agency case is certified to this Court under W.R.A.P. 12.09(b), we apply the standards for judicial review set forth in Wyo. Stat. Ann. § 16-3-114(c)."  *Jonah Energy LLC v. Wyo. Dep't of Revenue*, 2023 WY 87, ¶ 6, 534 P.3d 902, 905 (Wyo. 2023) (quoting *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue*, 2017 WY 6, ¶ 14, 387 P.3d 725, 729 (Wyo. 2017) (citing *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue*, 2002 WY 181, ¶ 9, 60 P.3d 129, 134 (Wyo. 2002))).  Wyo. Stat. Ann. § 16-3-114(c) provides:

> the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error.  The reviewing court shall:

> > (i)     Compel agency action unlawfully withheld or unreasonably delayed; and
> >
> > (ii)     Hold unlawful and set aside agency action, findings and conclusions found to be:
> >
> > > (A)     Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
> > >
> > > (B)     Contrary to constitutional right, power, privilege or immunity;
> > >
> > > (C)     In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
> > >
> > > (D)     Without observance of procedure required by law; or
> > >
> > > (E)     Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2023).

[¶10]  Chesapeake does not challenge the Board's findings of fact.  It asserts the Board incorrectly applied the law to the facts.  To resolve the dispute, we must interpret Wyo. Stat. Ann. § 39-14-203 and determine whether the Board correctly applied the statute to the undisputed facts.  Statutory interpretation is a question of law subject to de novo review. *Jonah Energy*, ¶ 7, 534 P.3d at 905; *Exxon Mobil Corp. v. State, Dep't of Revenue*, 2009 WY 139, ¶ 11, 219 P.3d 128, 134 (Wyo. 2009).

[¶11]  When we interpret statutes, we first determine whether the statute is unambiguous. *Exxon Mobil*, ¶ 11, 219 P.3d at 134 (citations omitted).  A statute is unambiguous if reasonable persons can "agree as to its meaning with consistency and predictability. Unless another meaning is clearly intended, words and phrases shall be taken in their ordinary and usual sense.  Conversely, a statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations." *Id.* (citations omitted).

## DISCUSSION

[¶12]  The fair market value of natural gas for severance and ad valorem tax purposes is determined after "the production process is completed."  Wyo. Stat. Ann. § 39-14-

4

203(b)(iv). "It is not always clear . . . just where the production process is completed and other operations, such as transportation, are begun." *Exxon Mobil*, ¶ 12, 219 P.3d at 134. In 1990, the legislature defined the completion of natural gas production:

> **The production process for natural gas is completed** after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed **at the inlet to the initial transportation related compressor, custody transfer meter or processing facility**, whichever occurs first[.]

Wyo. Stat. Ann. § 39-14-203(b)(iv) (LexisNexis 2023) (emphasis added). Essentially the statute provides two locations at which the production process can be complete: (1) if initial dehydration is performed in the field (other than within a processing facility), production is complete *after* extracting from the well, gathering, separating, injecting and any other activity which occurs *before* the outlet of the initial dehydrator; or (2) When no dehydration occurs other than within a processing facility, production is complete at: (i) the inlet to the transportation related compressor, (ii) the custody transfer meter, or (iii) the processing facility, whichever occurs first. Here, Chesapeake does not dispute that the initial dehydrators are the TEG dehydrators located in the seven facilities. It contends that the seven facilities are processing facilities, and no dehydration is performed other than within a processing facility. Therefore, production is complete at the custody transfer meter.

[¶13] The statutes do not define "processing facility," but "processing" is defined as:

> any activity occurring beyond the inlet to a natural gas **processing facility** that changes the well stream's physical or chemical characteristics, enhances the marketability of the stream, or enhances the value of the separate components of the stream. Processing includes, but is not limited to fractionation, absorption, adsorption, flashing, refrigeration, cryogenics, sweetening, **dehydration within a processing facility**, beneficiation, stabilizing, compression (other than production compression such as reinjection, wellhead pressure regulation or the changing of pressures and temperatures in a reservoir) and **separation which occurs within a processing facility**[.]

Wyo. Stat. Ann. § 39-14-201(a)(xviii) (emphasis added).

[¶14] The Department has not promulgated rules defining "processing facility." Because no definition of "processing facility" can be found in the Wyoming statutes or in the rules, differences have arisen between taxpayers and the Department as to what activities qualify as processing. In those cases, the taxpayer advocates for a point of valuation closer to the wellhead. *See, e.g.*, *Williams*, 107 P.3d 179; *Exxon Mobil*, 219 P.3d 128.

## A.    Precedent

[¶15] We have considered the application of Wyo. Stat. Ann. §§ 39-14-201(a)(xviii) and 39-14-203(b)(iv) in two relevant cases: *Williams* and *Exxon Mobil*.

### 1.   *Williams*

[¶16] In *Williams* this Court addressed valuation of coal bed methane (CBM) produced in Campbell County. *Williams*, ¶ 2, 107 P.3d at 181. In *Williams*, the Department determined that the correct point of valuation was at the outlet to the TEG dehydrator and assessed unpaid severance taxes. *Id.* ¶¶ 3, 12, 107 P.3d at 181, 184. Williams argued that because the TEG dehydrator performed some of the functions listed in the § 39-14-201(a)(xviii) definition of "processing," it was a processing facility. *Id.* ¶ 17, 107 P.3d at 185.

[¶17] In *Williams*, we concluded that "[i]n reality, the definition of processing [in the statute] is of little assistance in determining what the legislature meant by processing facility in the context of the severance tax statutes." *Id.* We turned to the statutory definition of "natural gas" for "insight into the legislative intent as to what was meant by 'processing' . . . ." *Id.* ¶ 18, 107 P.3d at 185. Wyo. Stat. Ann. § 39-14-201(a)(xv), defines natural gas for taxation purposes: "[T]he term natural gas includes products separated for sale or distribution during processing of the natural gas stream including, but not limited to plant condensate, natural gas liquids and sulfur[.]" We interpreted this "language [to] impl[y] that the legislature understood processing would separate certain products from the natural gas stream. Thus a processing plant logically would be a facility constructed to perform the function of removing such products." *Id.* ¶ 18, 107 P.3d at 185.

[¶18] We also looked to the meaning of "processing facility" in the oil and gas industry and noted that a processing plant is one that "removes liquefiable hydrocarbons from wet gas or casing-head gas." *Williams*, ¶ 19, 107 P.3d at 185–86 (citing Wyo. Stat. Ann. § 8-1-103(a)(i) (LexisNexis 2003); *Amoco Prod. Co. v. State*, 751 P.2d 379, 382–83 (Wyo. 1988); Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* at 833 (2003)). While the TEG dehydrator in *Williams* did separate some components from the gas stream, because that separation was incidental to the intended dehydration function, we held the TEG dehydrator was not a processing facility. *Id.* ¶ 20, 107 P.3d at 186.

## 2. *Exxon Mobil*

[¶19] Also relevant is *Exxon Mobil*. Exxon Mobil Corp. (Exxon) challenged the valuation of natural gas produced from its LaBarge Project in the Bridger-Teton National Forest in Sublette County, Wyoming. *Exxon Mobil*, ¶ 3, 219 P.3d at 132. At issue in *Exxon Mobil* was whether the Black Canyon facility was an "initial dehydrator" or a "processing facility."[6] *Id.* ¶¶ 13, 44, 219 P.3d at 134–35, 142. The Board concluded that it was an initial dehydrator and that the gas should be valued at the outlet of Black Canyon dehydrator. *Id.* ¶ 13, 219 P.3d at 134–35. On appeal, Exxon argued that Black Canyon was a processing facility and, although dehydration occurred there, the legislature intended the term "initial dehydrator" to "apply to facilities very different from Black Canyon." *Id.* ¶ 24, 219 P.3d at 137.

[¶20] The Board found that the natural gas produced at the LaBarge Project is unique, "no other natural gas stream in Wyoming is 'remotely similar'"—it is not flammable before processing; it has a high concentration of hydrogen sulfide ($H_2S$), which makes it lethal; and, when in contact with water, the $H_2S$ and carbon dioxide ($CO_2$) in the gas "form corrosive acids which can destroy a carbon steel pipeline." *Id.* ¶ 3, 219 P.3d at 132. The dehydration "of sour gas [at the Black Canyon facility] is inherently challenging and complex, . . . the gas is extremely lethal, . . . [t]he water removed . . . is also extremely acidic, and must be closely managed, . . . [and a]ir quality" considerations prevent burning emissions. *Id.* ¶ 6, 219 P.3d at 132–33. These factors naturally affected Exxon's production process.

[¶21] The LaBarge gas is piped from the wells to the Black Canyon facility, where it is dehydrated. From there, it is piped 40 miles to the Shute Creek facility where it is processed and separated into marketable products. Significantly, Exxon had initially planned for all processing and dehydration to occur at the Black Canyon facility, but because of "the environmental sensitivity of that site, [Exxon] was required to locate the main processing facilities" at Shute Creek. *Id.* ¶ 5, 219 P.3d at 132. The dehydration process at the Black Canyon facility utilizes a TEG solution to remove water vapor, but the process also removes other components from the gas stream—$H_2S$, $CO_2$, and heavy hydrocarbons. *Id.* ¶ 7, 219 P.3d at 133.

[¶22] We first considered whether the TEG dehydrator was an initial dehydrator and whether the size of the equipment had bearing on the answer to that question under the statute. We recognized that "[b]oth [traditional] Type 1 dehydrators and [the] Black Canyon [facility] use a TEG process to remove water vapor from the raw gas stream. Black Canyon['s dehydrator] is much larger in scale and complexity . . . ." *Id.* ¶ 26, 219 P.3d at

---

[6] Black Canyon is "large and complex," contains "more than 2 million square feet," with "office space for more than thirty full-time employees, a warehouse, a maintenance garage, and two separate processing train buildings." *Exxon Mobil*, ¶ 6, 219 P.3d at 132.

7

138. However, we found "no support in the statutes or our case law for the proposition that an initial dehydrator becomes something different when it reaches a certain size or complexity." *Id.*

[¶23] Next, the Court considered whether the facility was a processing facility. Exxon argued that because the amounts of $H_2S$ and $CO_2$ removed were so large, their removal cannot be considered incidental and their removal meant Black Canyon was a processing facility. We held that:

> [a] processing facility is a particular facility constructed for an intended or specialized purpose. The purpose of a processing facility, in simplified terms, is to remove components such as condensate, natural gas liquids, or sulfur from the gas stream . . . which changes the well stream's physical or chemical characteristics and enhances its marketability.

*Id.* ¶ 22, 219 P.3d at 137 (citing *Williams*, ¶ 19, 107 P.3d at 186 and Wyo. Stat. Ann. § 39-14-201(a)(xviii)). We recognized that $CO_2$ and $H_2S$ were removed from the gas stream and then reinjected into the gas stream at the Black Canyon facility, and that this changed the "physical or chemical characteristics" of the gas stream, and satisfied "that part of the statutory definition of processing." *Id.* ¶¶ 27, 30, 219 P.3d at 138–39 (Wyo. 2009) (citing Wyo. Stat. Ann. § 39-14-201(a)(xviii)). Nevertheless, we held that because the removal of $CO_2$ and $H_2S$ (regardless of the quantity) at the Black Canyon facility was incidental to the main function of the facility—dehydration—their removal would not qualify the facility as a processing facility under the statute. *Id.* ¶¶ 27–30, 219 P.3d at 138–39.

[¶24] We next considered the removal of heavy hydrocarbons. Because of complications arising from the separation of heavy hydrocarbons in the Shute Creek facility, Exxon designed and installed a larger, improved carbon filtration system at the Black Canyon facility to remove heavy hydrocarbons. *Id.* ¶ 31–32, 219 P.3d at 139. Those hydrocarbons were disposed of by burning. *Id.* ¶ 32, 219 P.3d at 139. Exxon argued that Black Canyon's removal of heavy hydrocarbons from the gas stream met the criteria of a processing facility. *Id.* ¶ 33, 219 P.3d at 139. The Department made two counterarguments. First, it asserted the volume of hydrocarbons removed was so small, their removal does not constitute processing. This Court rejected this argument, holding again that the quantity of hydrocarbons removed was "not the determining factor." *Id.* ¶ 34, 219 P.3d at 139. Next the Department argued that processing did not occur because the hydrocarbons were not saleable products. *Id.* ¶ 35, 219 P.3d at 140. We rejected the saleable products test, holding, "The statutory definition of processing refers to 'enhanc[ing] the marketability of the stream, or enhance[ing] the value of the separate components of the stream.' Removing heavy hydrocarbons . . . clearly enhances the marketability of the gas steam." *Id.* ¶¶ 37–39, 219 P.3d at 140–41.

[¶25] The Court identified "contradictions" in the application of the statute to the facts presented because it was "inclined to agree with the Department that Black Canyon [facility] fit[] the definition of an initial dehydrator," and it was "not convinced that [it was] a processing facility based on its temporary removal" of $H_2S$ and $CO_2$, but it was "inclined to agree with [Exxon] that [the] Black Canyon [facility] fit[] the definition of a processing facility because of its deliberate removal of heavy hydrocarbons." *Id.* ¶ 40, 219 P.3d at 141.

[¶26] The Court turned to "customary usage in the industry" to assist it in determining whether Black Hills was an initial dehydrator or a processing facility. *Id.* ¶ 41, 219 P.3d at 141. Exxon had an expert who testified that "within the petroleum industry, Black Canyon would not be considered an initial dehydrator" and that it "has all of the functional attributes of a natural gas processing facility . . . ." *Id.* The Court found this testimony "highly relevant in determining" the legislative intent when using terms initial dehydrator and processing facility. *Id.* ¶ 43, 219 P.3d at 141.

[¶27] The Court concluded that Black Canyon could be an initial dehydrator under *Williams* or it could be a processing facility because under customary industry usage, the removal of heavy hydrocarbons would be considered processing. *Id.* ¶ 46, 219 P.3d at 142. Faced with this ambiguity, the Court construed the statute in favor of the taxpayer, Exxon, and held Black Canyon was a processing facility. *Id.* ¶¶ 47–51, 219 P.3d at 142–43.

[¶28] While in *Exxon Mobil* we held that the statute was ambiguous, that determination was made under unique facts present in that case. An unambiguous statute may be ambiguous as applied. *See State v. Herman*, 2002 WI App 28, ¶ 14, 640 N.W.2d 539, 544 ("Although we have concluded that Wis. Stat. § 961.50 is unambiguous on its face, we recognize that a statute that is plain on its face may be rendered ambiguous by the context in which it is sought to be applied."); *Schmidt v. Trademark, Inc.*, 506 P.3d 267, 273 (Kan. 2022) ("Under these circumstances, we conclude that the construction of the statutory language is uncertain or ambiguous as applied to the facts of this case[.]" (quoting *State v. Walker*, 124 P.3d 39, 46 (Kan. 2005))). As applied to the facts in this case, Wyo. Stat. Ann. § 39-14-203(b)(iv) is unambiguous. *See BP Am. Prod. Co. v. Dep't of Revenue, State of Wyo.*, ¶ 20, 112 P.3d 596, 606 (Wyo. 2005) ("Given this context, and the particular facts of this case, this Court finds no necessity to construe the statutory terms[.]").

### 3. Principles Gleaned from the Caselaw

[¶29] *Williams* and *Exxon Mobil* provide key precepts applicable to this matter:

1. The size or complexity of a dehydrator is not determinative in considering whether a facility is a processing facility. *Exxon Mobil*, ¶ 26, 219 P.3d at 138.

9

2. An initial dehydrator is a piece of equipment and not a function. *Williams*, ¶ 17, 107 P.3d at 185; *Exxon Mobil*, ¶¶ 21–22, 26, 219 P.3d at 136–38.

3. The quantity of particles removed from the gas stream in a facility is not determinative in evaluating whether a facility is a processing facility. *Exxon Mobil*, ¶ 29, 219 P.3d at 138.

4. The intended and specialized purpose of the facility is significant. *Id.* ¶¶ 29–30, 219 P.3d at 138–39.

5. A processing facility anticipates a deliberate attempt to remove components other than water vapor, such as condensate, natural gas, or sulfur from the gas stream. *Id.* ¶¶ 22, 38, 219 P.3d at 137, 140.

6. A processing facility anticipates a deliberate attempt to change the physical and chemical characteristics of the stream to make the gas or the products removed more marketable. *Id.* ¶ 38, 219 P.3d at 140.

7. Unintended albeit beneficial side effects of TEG operations do not equate to an intended or specialized purpose. *Id.* ¶ 30, 219 P.3d at 138.

8. The separation of gas from saleable products is not determinative in evaluating whether a facility is a processing facility. *Id.* ¶¶ 37–39, 219 P.3d at 140.

9. Customary industry usage is highly relevant in determining whether a facility is a processing facility. *Exxon Mobil*, ¶ 43, 219 P.3d at 141; *Williams*, ¶ 17, 107 P.3d at 185.

## B. Application

[¶30] Applying these principles and our rules of statutory construction to this case brings us to the conclusion that the seven facilities here are not processing facilities.

### 1. *Williams* and *Exxon Mobil* are both relevant.

[¶31] Chesapeake's representative testified before the Board that natural gas produced by Chesapeake requires a different kind of processing than conventional natural gas.[7]

---

[7] By emphasizing the uniqueness of its facilities and of horizontally drilled natural gas, Chesapeake attempts to draw parallels with Exxon's Black Canyon facility, which was determined to be a processing facility. *Supra* ¶¶ 19–27. Chesapeake's facilities differ from Exxon's in some significant ways:

10

Chesapeake's natural gas is produced in significantly higher volumes, contains more NGL, and is produced at higher pressures and temperatures than conventional gas. It is undisputed that this case involves wet natural gas produced from horizontal wells, in contrast to conventional natural gas, CBM (in *Williams*), and sour gas (in *Exxon Mobil*). The Board considered this argument:

> Chesapeake offered yet an additional factor in support of its position that the seven field stations were "initial" processing facilities upstream of the two NGL Extraction Plants. It asserted that "horizontally" drilled wells first became prevalent in the area during the audit period and necessitated the installation of initial processing facilities in the field. Chesapeake more particularly argues that "[t]his rich, wet gas production from horizontal wells in this area differs from gas produced from conventional wells and requires a different processing facility to handle the gas." It continues, "the wet gas is produced in significantly higher initial volumes, at greater pressure, and at higher temperatures." Unfortunately, Chesapeake offered no technical evidence explaining why horizontal drilling, or the nature of the gas production in particular, should influence the analysis of whether separators, compressors, and dehydrators in the field perform processing.
>
> . . . It remains true today that all natural gas production, regardless of chemical make-up, extraction method, or circumstances under which the gas is produced, is valued under the same statute, Wyoming Statutes section 39-14-203(b)

---

- Exxon's LaBarge gas was unique in Wyoming. *Exxon Mobil*, ¶ 3, 219 P.3d at 132. In contrast, while horizontal drilling is a different technique, it is not unique to Chesapeake's wells in Converse County and the production and processing methodologies are standard in the industry.
- Exxon's Black Canyon is "notably large and complex" and contained office space for more than 30 full-time employees, a warehouse, a maintenance garage, two separate processing train buildings, *id.* ¶ 6, 219 P.3d at 132, and was manned 24 hours a day. Chesapeake's facilities, while large and complex, contain no office space, and have no on-site employees. They are monitored remotely.
- Exxon had to construct Shute Creek 40 miles from Black Canyon because of environmental sensitivity of the Black Canyon site. *Id.* ¶ 5, 219 P.3d at 132. There are no external reasons, environmental or otherwise, that forced the construction of the seven facilities here—the functions of those facilities were originally performed at the natural gas processing facilities but were later removed to handle the large quantities of gas produced as Chesapeake expanded its drilling.
- Exxon designed a unique carbon filtration system to adsorb and capture heavy hydrocarbon solids that were contaminating its equipment at Black Canyon. *Id.* ¶¶ 31–32, 219 P.3d at 139. Chesapeake's facilities have no equipment uniquely designed to address anomalous characteristics of the gas stream.

11

(2021). *See, e.g.*, *Solvay Chem., Inc. v. Wyo. Dep't of Revenue*, 2022 WY 122, 517 P.3d 1123 (Wyo. 2022) (Trona mining company's capture and use of escaping "waste gas" was taxable production of natural gas.). Moreover, the conventional gas production paradigm governs, so variations in how natural gas is produced, gathered, treated, handled, or processed must be made to fit within the conventional gas production framework for valuation purposes.

The reason for this is plain: the legislature has not addressed the point of valuation definitional omissions since the oft-cited *Williams* rulings issued in 2005 and 2008.

[¶32] This Court agrees that CBM, sour gas, and horizontally drilled gas have distinct characteristics that require variations in the methods used to extract and produce marketable products. In determining whether these characteristics have bearing on the question before the Court, we turn to *Williams* and *Exxon Mobil* for guidance.

### 2. The presence of a TEG dehydrator does not make a facility a processing facility.

[¶33] Unlike the dehydration and specialized carbon filtration system in *Exxon Mobil*, the facilities here are composed of a separator, compressors, a TEG dehydrator, slug catcher, fuel skids, and storage tanks. We have already held that the presence of a TEG dehydrator does not make a facility a processing facility. *Williams*, ¶ 14, 107 P.3d at 184; *Exxon Mobil*, ¶ 50, 219 P.3d at 143.

### 3. A "specialized purpose," if not processing, does not make a facility a processing facility.

[¶34] Chesapeake cites *Exxon Mobil*'s definition of a processing facility as "a particular facility constructed for an intended and specialized purpose. The purpose of a processing facility, in simplified terms, is to remove components such as condensate, natural gas liquids, or sulfur from the gas stream which changes the well stream's physical or chemical characteristics and enhances its marketability." *Exxon Mobil*, ¶ 22, 219 P.3d at 137 (citing *Williams*, ¶ 19, 107 P.3d at 186; Wyo. Stat. Ann. § 39-14-201(a)(xviii)). It argues that the facilities at issue here "were constructed for the specialized purpose of starting the processing functions that are eventually completed at Bucking Horse and Tallgrass." We must determine whether the "start of the processing functions" described by Chesapeake are processing or production under Wyoming's tax statutes.

12

### a. Volume

[¶35] Chesapeake's representative testified that without the seven facilities, Bucking Horse and Tallgrass would not be capable of handling the volumes of gas produced from the wells and production would be uneconomical. The Board analyzed this testimony and concluded that the volume of the gas did not explain why the facilities would be processing facilities:

> Another factor Mr. Armstrong offered in support of Chesapeake's position, the seven field stations prevented the two downstream facilities from becoming overwhelmed as Chesapeake increased gas production volumes sent to the NGL Extraction Plants. . . . Mr. Armstrong did not support this contention with engineering expertise or verifiable production estimates. Yet, the Department did not contest or otherwise respond to this point, possibly because it found such to be irrelevant. It may be that many production functions must be well performed for downstream processing facilities to operate efficiently. That a field station might benefit the operation of downstream equipment, or prevent bogging down of downstream processing facilities, is a heretofore untested reason for finding that separators and related equipment are "processing facilities" within the meaning of Wyoming's natural gas valuation statutes.

We agree. In *Exxon Mobil*, we concluded that the size or complexity of a dehydrator is not relevant to whether that dehydrator is an "initial dehydrator." *Exxon Mobil*, ¶ 26, 219 P.3d at 138. We also concluded that the quantity or proportion of particles removed from the gas stream is not determinative of whether the facility is a "processing facility." *Id.* ¶ 29, 219 P.3d at 138. Likewise, here, the volume of gas flowing through a facility is not determinative of whether that facility is a processing facility.

### b. Size of Separators

[¶36] Chesapeake also argues that its facilities are processing facilities because "these are sizeable separators. There is a large amount of gas." The Board found:

> Chesapeake's focus on the enormity of equipment does not signify that those facilities were "processing facilities," as opposed to large field gathering equipment that performed a production function. And, when asked why he considered the equipment to be so large and substantial, [Chesapeake's

13

representative] offered no basis of comparison or technical explanation, just his subjective observation.

> While we note that processing and production facilities may be very large and substantial, those characteristics occur for different reasons, including the degree of complexity, the accumulation of different equipment, or the type or volumes of gas involved. This is especially true for facilities that handle sour gas, requiring redundant environmental protection and emergency response systems. *See, e.g., In re Appeal of ExxonMobil*, 2008 WL 1692796, Doc. Nos. 2006-69, 2006-116, ¶¶ 17-62, 81-89, ** 6-14, 17-18 (Wyo. State Bd. of Equalization, April 3, 2008), *rev'd, Exxon Mobil Corp.*, 2009 WY 139, 219 P.3d 128 (Wyo. 2009) (Hill, J. dissenting) (Because the LaBarge gas reservoir was uniquely toxic and produced at exceptionally high volumes, the Black Canyon dehydrator was likewise uniquely large, complex, and necessarily located many miles from the downstream processing facility so that the gas could be more safely transported to the Shute Creek Processing facility.). Without further explanation of why the equipment's size mattered from a technical "processing" standpoint, we give little weight to Chesapeake's evidence of the equipment's relative size.

[¶37] In *Exxon Mobil*, the size of the Black Canyon facility was not determinative. The Court relied on the technical issues which required a unique process and development of specialized equipment in arriving at the conclusion the Black Canyon facility was arguably a processing facility. *Exxon Mobil*, ¶ 33, 219 P.3d at 139. The size of the equipment by itself does not resolve whether a facility is a processing facility. Chesapeake provided no technical explanation as to the significance of the separators' size in processing. We agree with the Board that absent an explanation connecting equipment's size to processing, little weight should be given to equipment's size.

### c. Separation of Heavy Hydrocarbons

[¶38] Chesapeake argues that because heavy hydrocarbons are separated from the gas stream by separators and are then stored and later sold, the facility is a processing facility. The Board considered this argument:

> From a more technical perspective in support of Chesapeake's position, Mr. Armstrong repeatedly cited the separation of significant heavy hydrocarbons from the gas. . . . Here again, without more, this is of little significance.

14

Separators, by design and according to statutory definition, separate gas from liquids. . . . The legislature expressly recognized that separation may occur in the field during production, or within processing facilities along with other less common processes, such as cryogenics.

[¶39]  While removing heavy hydrocarbons from the gas stream "changes [its] physical or chemical characteristics" and "enhances the marketability of the [gas] stream," separating can only be considered "processing" when it occurs in a "processing facility."  Wyo. Stat. Ann. § 39-14-201(a)(xviii).  Wyo. Stat. Ann. § 39-14-201(a)(xxii) defines "separating" as "the isolation of the well stream into discrete gas, liquid hydrocarbons, liquid water and solid components[.]"  Here, the heavy hydrocarbons removed from the gas stream are "naturally entrained within the condensate" and are considered liquid hydrocarbons.[8]  The Board quoted the Department's valuation manager who testified regarding separation:

> When you produce a rich gas, you have a separator. That's just the way it works.  These compression facilities, most of them have some sort of TEG dehydrator, but just about all of them have some sort of separator in order to get the gas into a gaseous state and remove all the liquids that need to be removed.
>
> And each of those functions is of themselves production functions, and so if we were to say they are no longer production functions, but are processing functions, essentially this whole point of valuation issue would—all of the statute would become moot.  All of the guidelines that the legislature has determined would become irrelevant.  Because, basically, everywhere there was a separator, everywhere there was a wide spot in the line, . . . you would magically create a processing facility and that's not the way the statutes are written.

[¶40]  Like dehydration, separation is a function included in the definition of "gathering" under Wyo. Stat. Ann. § 39-14-201(a)(ix).  The Board explained why separation that occurs during gathering does not create a processing facility:

> Mr. Armstrong's [assertion that separation of heavy hydrocarbons makes the facilities processing facilities] leaves unanswered the critical question: why the seven field stations

_____

[8] The Department's employee explained "what you're talking about are the natural gas liquids that go down into the cryogenic plants and are physically removed using a pressure and temperature to physically remove" them.

15

upstream of the two processing facilities were "initial processing," rather than gathering? "Gathering" is the "transportation of crude oil, lease condensate or natural gas from multipole [sic] wells by separate and individual pipelines to a central point of accumulation, dehydration, compression, separation, heating and treating or storage." Wyo. Stat. Ann. § 39-14-201(a)(ix) (2021). Were we to agree with Chesapeake's argument on this reasoning alone, we could find that the separators at the well pads performed processing as well. Yet, Chesapeake does not press that claim.

[¶41]   The statute is clear that separation can only be considered processing when it occurs within a processing facility. Wyo. Stat. Ann. § 39-14-201(a)(xviii). The fact that separation is occurring in a facility does not in itself render a facility a processing facility.

### d. Industry Classification

[¶42]   The industry's classification of a facility as a processing facility is significant. When we interpret statutes, "[w]ords and phrases shall be taken in their ordinary and usual sense, but *technical words* and phrases having a peculiar and appropriate meaning in law *shall be understood according to their technical import.*" *Amoco*, 751 P.2d at 383 (citation omitted). In *Williams*, the Board relied on "customary usage in the industry" when it interpreted the term, "processing facility." *Williams*, ¶¶ 17, 19, 107 P.3d at 185–86 n.2. In *Exxon Mobil*, Exxon's expert testified that Black Canyon has "all of the functional attributes of a natural gas processing facility." *Exxon Mobil*, ¶ 41, 219 P.3d at 141. This Court held that the industry's classification "is highly relevant" and was a "strong factor" in considering whether the facility there was a processing facility. *Id.* ¶¶ 43, 46, 219 P.3d at 141–42.

[¶43]   Here, Chesapeake presented no evidence regarding the industry's classification of the seven facilities. The Board relied on testimony from Department representatives who testified that Chesapeake's production is "a typical production scenario in conventional gas in the State of Wyoming," and the Rawhide facility "is what a standard compression facility looks like."

[¶44]   Wyo. Stat. Ann. § 39-14-203(b)(iv) has been a bountiful source of litigation, and this is likely to continue as oil and gas production and processing technologies evolve. The statute's failure to define "processing facility" makes application of the statute difficult for taxpayers, the Department, and the courts. Based on the language of the statute and our prior application of it, *see Williams* and *Exxon Mobil*, the seven facilities are not processing facilities. None of the arguments proffered by Chesapeake—the volume of gas, the size of the separators, or the fact that separation is occurring—qualify the seven facilities as

16

processing facilities.  Completion of Chesapeake's natural gas production occurred at the outlet of the initial dehydrator.

## *CONCLUSION*

[¶45]  The Board correctly interpreted and applied Wyo. Stat. Ann. § 39-14-201(a)(xviii) when it found Chesapeake's facilities are not processing facilities.   The Board's determination that the point of valuation for Chesapeake's natural gas was the outlet of the TEG dehydrator was supported by substantial evidence and is in accordance with the law. We affirm.